*This opinion is subject to revision before final*
*Publication in the Pacific Reporter*

**2017 UT 89**

IN THE

**SUPREME COURT OF THE STATE OF UTAH**

MICHAEL NEESE,
*Appellant,*

*v.*

UTAH BOARD OF PARDONS AND PAROLE,
*Appellee.*

No. 20150487
Filed December 14, 2017

On Certification from the Utah Court of Appeals

Sixth District, Manti
The Honorable Wallace A. Lee
No. 140600017

Attorneys:

Marshall Thompson, Salt Lake City, for appellant

Sean D. Reyes, Att'y Gen., Brent A. Burnett, Asst. Solic. Gen., Amanda
N. Montague, Asst. Att'y Gen., Salt Lake City, for appellee

JUSTICE HIMONAS authored the opinion of the Court, in which
JUSTICE DURHAM† and JUSTICE PEARCE joined, and in which
CHIEF JUSTICE DURRANT joined in Parts I, II, and III.A.

CHIEF JUSTICE DURRANT filed an opinion concurring in part and
concurring in the result.

ASSOCIATE CHIEF JUSTICE LEE filed a dissenting opinion.

---

† Justice Durham sat on this case and voted prior to her retirement
on November 15, 2017.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶ 1   Michael Neese, a Utah prison inmate, has never been convicted of a sex offense, subjected to prison discipline for sexual misconduct, or otherwise adjudicated a sexual offender. Yet the Board of Pardons and Parole (Parole Board) has denied him an original release date for parole largely based on its determination that he's a sex offender and his refusal to participate in sex offender treatment. Applying the principles we articulated in *Labrum v. Utah State Board of Pardons*, 870 P.2d 902 (Utah 1993), we hold today that the district court erred in granting summary judgment to the Parole Board on the question of whether it violated Mr. Neese's due process rights under article I, section 7 of the Utah Constitution. Before the Parole Board may take the refusal of inmates in Mr. Neese's shoes to participate in sex offender treatment into consideration in deciding whether to grant them parole, it owes them (1) timely, particularized written notice that allegations they committed unconvicted sexual offenses will be decided; (2) the opportunity to call witnesses; and (3) a written decision adequately explaining its basis for determining that they're sex offenders and asking them to participate in sex offender treatment.

## BACKGROUND

¶ 2   After his trial on forcible sodomy ended in a mistrial, Mr. Neese pleaded guilty to two counts of obstruction of justice, one count of theft, and one count of burglary. Mr. Neese received a composite prison sentence of two to thirty years. Under Utah's discretionary sentencing scheme, this meant that the Parole Board was authorized to order Mr. Neese's release any time between two and thirty years from his sentence and commitment. A nonbinding "sentencing matrix" prepared for the district court estimated that Mr. Neese would likely serve forty-six months, with an anticipated release date in 2014.[1]

¶ 3   Mr. Neese's original parole hearing began on September 13, 2011. The hearing officer asked Mr. Neese about his criminal history,

---

[1] Because this is an appeal from an order granting summary judgment in favor of the Parole Board, we summarize the facts in the light most favorable to Mr. Neese. *See Borghetti v. Sys. & Comput. Tech., Inc.*, 2008 UT 77, ¶ 12, 199 P.3d 907.

his record in prison, and his plans upon release. Mr. Neese only partially accepted responsibility for the offenses to which he pleaded guilty, and he minimized his prior criminal record. Mr. Neese also reported that he'd successfully participated in anger management and other prison programming, and he stated that, upon release, he intended to work in construction.

¶ 4  The hearing officer questioned Mr. Neese extensively about allegations that he'd raped his friends' daughter in 2009, while he was an overnight guest at her parents' house. The hearing officer based his questions on Mr. Neese's presentence report, police reports, a victim statement, and correspondence from the prosecuting attorneys in Mr. Neese's case, all of which stated that the seventeen-year-old daughter of one of Mr. Neese's longtime friends had told police that she had awoken to find Mr. Neese in her bed with his erect penis between the cheeks of her buttocks.[2]

¶ 5  In response to the hearing officer's questioning, Mr. Neese "denied attempting to sodomize the victim." He acknowledged that he'd entered her room while she was sleeping and that his shirt was off at the time, but he explained that he did so because he was about to go to sleep, needed a pillow and blanket, and knew that was where his host kept spare bedding. He speculated that the alleged victim—who he testified had previously been the victim of sexual abuse—had falsely accused him because she'd been "startled" by seeing him in her room with his shirt off.

¶ 6  After his first hearing, the Parole Board declined to set a release date and scheduled a rehearing. It based its decision on (1) his "[h]istory of similar offenses," (2) his "[h]istory of unsuccessful . . . supervisions," (3) the fact that he'd been convicted of offenses involving "[m]ultiple incidents and/or victims," (4) the "[p]ersonal gain he reaped from the offense," (5) his "[d]enial or minimization . . . of responsibility," (6) his history of "[r]epeated, numerous . . . incarceration[s] or parole revocation[s]," and (7) his lack of "[o]verall rehabilitative progress and promise." The Parole Board scheduled the rehearing for Mr. Neese on February 1, 2014, and it stated that a sex

---

[2] Mr. Neese was tried on these allegations, but the proceeding ended in a mistrial. As far as the record reveals, Mr. Neese has never been convicted of this or any other sex offense.

offender treatment memorandum was "due to the Board of Pardons by 01/2014."

¶ 7    Mr. Neese's rehearing took place on February 13, 2014. Unlike at his first hearing, Mr. Neese accepted responsibility for the crimes of which he was convicted and didn't seek to minimize his prior criminal history other than refusing to discuss his juvenile record because he considered it "irrelevant." The hearing officer noted that Mr. Neese had been a "good inmate" who had completed numerous life skills classes, and Mr. Neese again emphasized that he intended to do construction work once he was released.

¶ 8    As at Mr. Neese's first hearing, the hearing officer again asked Mr. Neese about his alleged 2009 sex offense. Mr. Neese again denied these allegations and testified in detail—and consistent with the testimony he gave at his first parole hearing—about what had happened, why he believed he was falsely accused, and why he thought his accuser was not credible.  Mr. Neese stated that he wasn't willing to participate in sex offender treatment.

¶ 9    At the end of the second hearing, the hearing officer stated that he didn't "buy [Mr. Neese's] story on the sex offense." He also telegraphed that Mr. Neese's refusal to participate in sex offender treatment would be, as the district court found it was, a factor in his recommendation to the Parole Board, stating, "I'm gonna take the matter under advisement as far as what I'm gonna recommend [to the Parole Board], but . . . I wish you'd . . . been willing to do sex offender treatment, that would have been a lot better."

¶ 10  On February 20, 2014, the Parole Board declined for a second time to fix an early release date for Mr. Neese. Among the reasons it gave was Mr. Neese's refusal to accept responsibility—a consideration that could only apply on the assumption that Mr. Neese had committed a sexual offense because Mr. Neese had accepted responsibility for his other crimes. The Parole Board scheduled a third hearing for Mr. Neese, and again ordered the Department of Corrections to prepare a sex offender treatment memorandum.

¶ 11 After he was denied a release date for a second time, Mr. Neese filed a pro se petition for a writ of extraordinary relief. His lawsuit alleged that the Parole Board's determination that he was a sex offender and its decision to condition his parole on successful completion of sex offender treatment violated his due process rights. Mr. Neese also asked the district court to appoint counsel. The district

court denied Mr. Neese's request for counsel and dismissed Mr. Neese's complaint as frivolous, but the court of appeals reversed after concluding that Mr. Neese had raised a nonfrivolous issue implicating "the fairness of the process by which the [Parole] Board undertakes its sentencing function." *Neese v. Utah Bd. of Pardons & Parole*, No. 2014647-CA (unpublished order Nov. 20, 2014) (quoting *Padilla v. Utah Bd. of Pardons & Parole*, 947 P.2d 664, 667 (Utah 1997)).

¶ 12 On remand, the Parole Board moved for summary judgment and Mr. Neese filed a response in opposition. The district court granted summary judgment for the Parole Board, concluding that Mr. Neese received due process under the state constitution.

¶ 13 Mr. Neese now appeals. He argues that the Parole Board's determinations violate (1) the Utah Constitution's unnecessary rigor provision, (2) the Utah Constitution's due process provision, (3) the Eighth Amendment's prohibition on cruel and unusual punishment, and (4) the Fourteenth Amendment's Due Process Clause.

¶ 14 Utah Code section 78A-3-102(3)(b) gives us jurisdiction.

## PRESERVATION

¶ 15 Because this case poses significant preservation problems, we first address which of Mr. Neese's claims are preserved for review.

¶ 16 The preservation requirement is a "self-imposed" rule of "prudence" that aims to promote fairness and judicial economy. *Fort Pierce Indus. Park Phases II, III and IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 13, 379 P.3d 1218 (citation omitted). "As a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346 (citation omitted). To be adequately raised, a claim "must at least be raised to a level of consciousness such that the trial [court] can consider it." *State v. Cruz*, 2005 UT 45, ¶ 33, 122 P.3d 543 (alteration in original) (citation omitted). Thus, an issue is preserved when it's "presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 25, 266 P.3d 702 (citation omitted) (internal quotation marks omitted). Similarly, when a lower court decides "to take up [a] question," this decision "conclusively overc[o]me[s] any objection that the issue was not preserved for appeal" because the issue has consciously been addressed by the court. *Shakespeare*, 2016 UT 28, ¶ 13 (citation omitted). But the mere fact that a party "mention[ed] . . . an issue without introducing supporting

evidence or relevant legal authority" doesn't suffice to preserve it for appeal. *Cruz*, 2005 UT 45, ¶ 33 (second alteration in original) (citation omitted) (internal quotation marks omitted).

¶ 17 Two of Mr. Neese's arguments on appeal—his Eighth Amendment and unnecessary rigor challenges—are plainly unpreserved. Mr. Neese never raised an Eighth Amendment challenge to the Parole Board's actions in his petition for an extraordinary writ, and he mentioned the unnecessary rigor provision only once, without connecting it to any facts, law, or argument. Neither the Parole Board nor the district court considered these claims, nor did the court of appeals otherwise put these claims at issue in its order vacating the district court's determination that Mr. Neese's petition was frivolous and remanding to give the Parole Board an opportunity to explain why its proceedings respected Mr. Neese's due process rights. These claims are therefore not properly before us. *See State v. Worwood*, 2007 UT 47, ¶ 16, 164 P.3d 397 ("[P]erfunctorily mentioning an issue, without more, does not preserve it for appeal." (citation omitted)); *see also State v. Winfield*, 2006 UT 4, ¶ 19, 128 P.3d 1171 (while pro se litigants "should be accorded every consideration that may reasonably be indulged" they're nonetheless "held to the same standard of knowledge and practice as any qualified member of the bar" (citations omitted)).

¶ 18 On the other hand, Mr. Neese's due process claims are preserved and properly before us. Mr. Neese preserved his federal due process claim in his petition for an extraordinary writ. He argued at length that the Parole Board's finding that he'd committed a sex offense of which he'd never been convicted and that its decision to factor his refusal to participate in sex offender treatment into its early release determination violated the Due Process Clause of the Fourteenth Amendment. And he adduced detailed facts and pertinent legal authority in support of this claim.

¶ 19 As the Parole Board acknowledged in its briefing to this court, Mr. Neese's state due process claim was likewise preserved before the district court. While Mr. Neese's petition didn't itself plead a separate due process claim under our constitution, the court of appeals injected the issue into the underlying proceeding when it directed the district court to solicit a response from the Parole Board on the "fairness of the process by which the [Parole] Board undertakes its sentencing function" under *Padilla v. Utah Board of Pardons & Parole*, 947 P.2d 664, 667 (Utah 1997) (citation omitted)—a state due process case. Based on the court of appeals' order, the Parole Board understood the issue

before the district court to be "whether an inmate not convicted of a sex offense can be required to participate in sex offender treatment for purposes of determining eligibility for release on parole," and it cited *Padilla* in support of its argument that Mr. Neese received adequate due process protections. Similarly, the district court relied on *Labrum v. Utah State Board of Pardons*, 870 P.2d 902 (Utah 1993)—a case solely addressing the due process protections an inmate enjoys under article I, section 7 of the Utah Constitution—in concluding that Mr. Neese had received adequate due process protections. Thus, because the Parole Board understood the state due process provision to be implicated in Mr. Neese's petition for extraordinary relief, and because the district court itself "[took] up the question," Mr. Neese's state due process claim is preserved. *Shakespeare*, 2016 UT 28, ¶ 13.[3]

¶ 20 Because Mr. Neese's due process claims are preserved for appeal, we now turn to their merits.

### STANDARD OF REVIEW

¶ 21 The question in this case is whether the district court erred in granting summary judgment in favor of the Parole Board on Mr. Neese's due process claims. "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness." *Salt Lake City Corp. v. Jordan River Restoration Network*, 2012 UT 84, ¶ 47, 299 P.3d 990 (quoting *Chen v. Stewart*, 2004 UT 82, ¶ 25, 100 P.3d 1177). When a due process question requires "application of facts in the record to the due process standard, we incorporate a clearly erroneous standard for the necessary subsidiary factual

---

[3] While the Parole Board concedes the issue of what process Mr. Neese was entitled to "was preserved below," it notes in passing that Mr. Neese's petition for an extraordinary writ in the district court didn't specify the precise due process protections to which Mr. Neese believed he was entitled. This statement, read in context, is a suggestion that Mr. Neese hasn't met his burden of persuasion. But because this issue was inadequately briefed, it's of no consequence. Moreover, Mr. Neese asserted that the Parole Board acted in violation of his due process rights, and he sought reversal of its determinations on that basis. It's enough under the circumstances that he argued that the process he received was insufficient to justify the Parole Board's actions.

determinations." *Id.* (quoting *Chen*, 2004 UT 82, ¶ 25). But on summary judgment, all factual inferences must be drawn in favor of the nonmoving party as a matter of law, and we therefore review an award of summary judgment on a due process issue only for correctness. *See Rupp v. Moffo*, 2015 UT 71, ¶ 5, 358 P.3d 1060.

## ANALYSIS

¶ 22   Our court has on occasion advocated for a primacy approach under which "a state court looks first to state constitutional law, develops independent doctrine and precedent, and decides federal questions only when state law is not dispositive." *State v. Worwood*, 2007 UT 47, ¶ 15, 164 P.3d 397 (citation omitted). Here we begin with Mr. Neese's state due process claim.

¶ 23   Article I, section 7 of the Utah Constitution provides that "[n]o person shall be deprived of life, liberty or property, without due process of law." In *Labrum v. Utah State Board of Pardons*, we held that this provision extends the protection of "fundamental principles of due process" to inmates at "original parole grant hearings at which predicted terms of incarceration are determined." 870 P.2d 902, 911 (Utah 1993); *see also Neel v. Holden*, 886 P.2d 1097, 1101 (Utah 1994) (state due process protections apply to all parole hearings prior to and including the "hearing[] at which an inmate's release date is fixed"). This is because Utah has an indeterminate sentencing scheme under which the district court's role is limited to imposing the statutorily prescribed range of years for the offense of conviction. Within this range—in this case, two to thirty years—it's "left to the unfettered discretion" of the Parole Board to fix the term of imprisonment. *Labrum*, 870 P.2d at 908 (quoting *Foote v. Utah Bd. of Pardons*, 808 P.2d 734, 735 (Utah 1991)). As a consequence of this discretion, original parole grant hearings—those hearings at which the Parole Board makes "the first determination of the actual term the inmate is to serve in prison"—are in "reality . . . analogous to sentencing hearings and require due process to the extent that the analogy holds." *Id.*

¶ 24   The hearings at issue here are original parole grant hearings directly subject to *Labrum*'s due process protections. These protections vary depending on the demands of the particular situation. *See id.* at 911 ("Due process is flexible and calls for the procedural protections that the given situation demands." (quoting *In re Whitesel*, 763 P.2d 199, 203 (Wash. 1988) (en banc))). To determine what procedural protections are due in a given case requires that we attend to the two "critical

functions" of procedural due process: (1) to reduce the risk of error and (2) to "preserve the appearance of fairness and the confidence of inmates in the decisionmaking process." *Id.* at 909–10 (citation omitted). *Labrum* also instructs us to develop these procedures with an eye toward safeguarding other important criminal procedure values: "promot[ing] uniformity in sentences, reduc[ing] the need for trials by encouraging rational plea bargains, and provid[ing] incentives for good behavior in prison." *Id.* at 908.

## I. MR. NEESE WAS ENTITLED TO GREATER PROCESS THAN HE RECEIVED AT HIS ORIGINAL PAROLE GRANT HEARINGS

¶ 25 With these principles in mind, we turn to what procedural protections the Parole Board must respect before it determines that someone who has never before been adjudicated a sex offender is one and effectively conditions his early release on his participation in sex offender treatment. In *Labrum*, the petitioner argued that he was entitled (1) to "receive adequate notice to prepare for [his] parole release hearing" and (2) to "receive copies or a summary of the information in the [Parole] Board's file on which the [Parole] Board will rely." *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 904 (Utah 1993). We agreed. We explained that providing an inmate with notice of both his parole hearing and the information on which the Parole Board intended to rely in making its determination would both reduce the risk of error (by allowing the inmate to point out factual inaccuracies in his file) and promote the inmate's perception of fairness (by ensuring that his concerns were taken into account by the Parole Board). *Id.* at 909. And we held that these protections helped promote sentence uniformity, the rationality of plea bargains, and good behavior in prison. *Id.* at 908.

¶ 26 *Labrum* didn't purport to exhaustively list the procedural protections to which the Utah Constitution entitles an inmate in an original parole hearing. Instead, *Labrum* "emphasize[d] . . . that this opinion . . . addresses only those procedures specifically requested by this petitioner." *Id.* at 911. It also explained that, in many cases, the only question will be whether the information before the Parole Board has basic factual inaccuracies that the inmate can correct simply by bringing them to the hearing officer's attention. *See id.* at 909–10 (quoting *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 33 & n.15 (1979) (Marshall, J., dissenting)). But it left for another day "[t]he extent to which additional due process protections must be

afforded inmates in this and other proceedings in the parole system," which it recognized would "require case-by-case review." *Id.* at 911.

¶ 27 Applying the framework that *Labrum* articulated, we conclude that the case before us calls for additional procedural protections, over and above notice of a hearing and the opportunity to review the information on which the Parole Board will rely in making its determination about whether, and when, to fix Mr. Neese's initial release date. The Parole Board's conduct in this case is, at a minimum, closely analogous to a sentencing court's considering uncharged or unconvicted conduct in fixing a defendant's sentence.[4] *See id.* at 908 (due process protections apply when Parole Board acting analogously to a sentencing court). In this case, the Parole Board has concluded that Mr. Neese committed a sexual offense of which he's never been convicted (or otherwise found liable), that Mr. Neese was unsuccessfully tried on, and culpability for which Mr. Neese specifically bargained away in plea negotiations.

¶ 28 In this circumstance—essentially turning the presumption of innocence on its head and imprisoning a person for decades for a sex crime they've never been convicted of—the two "critical functions" of procedural due process—minimizing error and promoting the perception of fairness—require greater procedural protections than thin notice and the opportunity to review the Parole Board's information.

¶ 29 Nor is simply giving the inmate an opportunity to speak on his own behalf enough to reduce the risk of error when, as here, unconvicted sexual conduct logically distinct from the offenses of conviction is at issue. *See Neel v. Holden*, 886 P.2d 1097, 1103 (Utah 1994) ("[T]he touchstone of due process in the context of parole hearings is whether the proposed procedural due process requirement substantially furthers the accuracy and reliability of the [Parole] Board's fact-finding process."). This case is different from those instances where the Parole Board is reviewing presumptively reliable court and disciplinary files or otherwise taking into account undisputed background facts about the inmate or his victim. *Cf. id.* (denying that due process provision gives an inmate the right to have counsel address the Parole Board when the inmate "failed to show how the further participation of counsel at the hearing would have affected the

---

[4] We take care to say "at a minimum" because it may be more accurate for us to describe what happened here as a lopsided trial.

accuracy of the information considered by the [Parole] Board"); *Monson v. Carver*, 928 P.2d 1017, 1030 (Utah 1996) (denying an inmate the right to call character witnesses). When the Parole Board is assessing whether an inmate has committed unconvicted conduct, it's sitting as a judicial fact-finder for purposes of parole adjudicating the inmate guilty of a criminal offense of which the inmate was never convicted. In both criminal trials and the closely related context of prison disciplinary proceedings, where prison authorities seek to determine whether an inmate has committed a disciplinary infraction, due process affords inmates greater procedural protections than Mr. Neese received. *See Wolff v. McDonnell*, 418 U.S. 539, 564, 566 (1974) (with exceptions for prison safety, inmates have due process right "to call witnesses and present documentary evidence" in prison disciplinary proceedings because "the right to present evidence is basic to a fair hearing"; they also have a right to a detailed written rationale of the disciplinary determination); *see also Rock v. Arkansas*, 483 U.S. 44, 52 (1987) (compulsory process in criminal cases).

¶ 30 Additional procedural protections are particularly important when the Parole Board is considering whether an inmate has committed an unconvicted sex offense. The determination that an inmate has committed a sex offense triggers an unusually—perhaps uniquely—harsh set of consequences. Construing the record in the light most favorable to Mr. Neese, as we must, it appears that the Parole Board places significant and perhaps determinative weight on whether an inmate deemed to be a sex offender has participated in sex offender treatment in making its early release determinations. But a prerequisite to participating in sex offender treatment is admitting to having committed a sex offense. *See State v. Humphrey*, 2003 UT App 333, ¶ 5, 79 P.3d 960 (noting that sex offender treatment programs require inmates to "admit[] guilt"). Thus, unlike in other situations where the Parole Board might erroneously conclude that an inmate has committed unconvicted conduct and ask that the inmate participate in additional prison programming, when the Parole Board erroneously determines that an inmate is a sex offender, that inmate *can't* truthfully participate in the treatment program. Unconvicted sex offenses thus pose a unique problem that requires unique procedural protections.

¶ 31 There are additional reasons why the interest in minimizing error is particularly urgent in cases where the Parole Board has determined that an inmate has committed a sex offense of which he's not been convicted, and where—as here—it's alleged that this

determination has caused the Department of Corrections to classify the inmate as a sex offender. Inmates who are classified as sex offenders are beaten and raped at significantly higher rates than others in the prison population. *See Renchenski v. Williams*, 622 F.3d 315, 326 (3d Cir. 2010) ("[S]ex offenders are considered an anathema in the inmate subculture . . . [and] inmate norms call for their savage beating." (alterations in original) (citation omitted) (internal quotation marks omitted)); Alice Ristroph, *Sexual Punishments*, 15 COLUM. J. GENDER & L. 139, 159–60 (2006) ("[S]ex offenders are a distinct and disfavored category within prison populations, subject to heightened abuse from both corrections officers and fellow inmates. By many reports, sex offenders are themselves disproportionately likely to be the target of sexual assault in prison." (citations omitted)); *see also* U.S. DEP'T OF JUSTICE, NATIONAL PRISON RAPE ELIMINATION COMMISSION REPORT 75 (2009), https://perma.cc/Y762-K8U5 (noting that inmates with "prior convictions for sex offenses against an adult or child" face a heightened "risk of victimization" in prison). Additionally, sex offender treatment is highly invasive and degrading. Among other things, male participants are required to undergo penile plethysmograph tests, in which they're shown pornography while their penis is hooked to a device that measures blood flow and, hence, arousal. *See* UTAH ADMIN. CODE R. 251-109-6(2). According to Mr. Neese's pleadings, they're also removed from the general prison population and placed in more restrictive conditions and in closer proximity to sexual predators. These deleterious effects, when coupled with the problem that it's impossible for a person who has erroneously been classified as a sex offender to truthfully participate in sex offender treatment, make the risk of error in cases where the Parole Board decides that an inmate has committed an unconvicted sex offense particularly acute.

¶ 32 Additional procedural protections are also needed to protect the integrity of the parole-grant process and to promote the other criminal procedure values that *Labrum* seeks to safeguard: uniformity in sentences, rational plea bargaining, and good behavior in prison. *Labrum*, 870 P.2d at 908. As far as the record before us reveals, Mr. Neese has never been convicted of a sex offense or adjudicated a sex offender in a disciplinary, juvenile, or any other proceeding. While he was tried for a sex offense, the trial ended in a mistrial, and Mr. Neese subsequently entered a plea agreement only to other, nonsexual charges. In short, Mr. Neese accepted an offer to plead to nonsexual crimes after having steadfastly maintained that he was

innocent of sexual misconduct, having gone to trial to hold the State to its burden of proving him guilty of a sex offense and having not been convicted. We think an inmate in this position would justly question the integrity of a system in which the Parole Board could, after all this, adjudge him a sex offender and postpone his release date for up to *twenty-eight years* based solely on unproven allegations and without giving the inmate the opportunity to call witnesses or affording him a meaningful explanation of its decision.

¶ 33 The risk of unjustified sentencing disparities in such a system is great. By the same token, defendants will be justifiably wary of accepting plea deals if they know that bargained-for dismissed charges, on which they have steadfastly maintained their innocence and that are not logically implicit in the factual basis of their allocution, can come roaring back at their parole hearing and result in a sentence decades longer than the sentence all parties contemplated based on the sentencing matrix at the time. And, given that the perception of fairness is important to good behavior in prison, this value will also be well-served by according inmates in Mr. Neese's shoes the procedural protections that basic fairness requires. *See id.*

¶ 34 The transcripts of the parole-grant hearings in this case underscore the need for additional procedural protections for inmates like Mr. Neese. In both his initial parole hearing and his rehearing in 2014, Mr. Neese testified consistently and emphatically that he wasn't a sexual offender. The transcripts of these hearings reveal that both his account of the events of the night on which he was accused of committing rape and his explanation of why the alleged victim falsely accused him have surface plausibility. We're hard pressed to see how Mr. Neese could have mounted a more effective defense while availing himself only of the basic due process protections to which *Labrum* entitles all inmates. Yet, without explaining why, the Parole Board chose to believe unproven allegations in a police report over Mr. Neese's explanation of why they were false. We lack confidence in the accuracy of these proceedings.

¶ 35 On appeal, the Parole Board argues that because Mr. Neese isn't entitled to parole, he can't have a "protectable liberty interest" in early release that would trigger the protections of due process over and above what *Labrum* already requires. The Parole Board directs our attention to federal cases holding that, in discretionary parole systems, parole boards may ask inmates to participate in sex offender treatment

and even make participation a precondition to early release without according any process at all.

¶ 36    The Parole Board appears to be correct that Mr. Neese doesn't enjoy federal procedural due process protections in a discretionary parole grant hearing. Under federal law, the Due Process Clause applies only to prospective parolees who have a protected "liberty interest" in early release. *Sandin v. Conner*, 515 U.S. 472, 477 (1995). But only prospective parolees who enjoy a legal entitlement or presumption in favor of early release—for example, because a statute presumptively entitles them to good-time credit—are deemed to have such a liberty interest. *See Greenholtz*, 442 U.S. at 7 ("The Due Process Clause applies when government action deprives a person of liberty or property . . . [but t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."); *see also Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987) ("[T]he presence of a parole system by itself does not give rise to a constitutionally protected liberty interest in parole release."). Because discretionary parole systems don't create presumptive entitlements to early release, the federal Due Process Clause doesn't apply to require any particular process before the Parole Board (1) denies early release based, in part, on its determination that an inmate is a sex offender or even (2) makes the inmate's participation in sex offender treatment a precondition of early release. *See, e.g.*, *Straley v. Utah Bd. of Pardons*, 582 F.3d 1208, 1214–15 (10th Cir. 2009) (Because "[t]he Utah parole statutes grant the [Parole] Board complete discretion in making parole decisions [and an inmate] has no state entitlement to parole . . . [t]he Utah parole statutes . . . do not create a liberty interest entitling [an inmate] to federal due process protections."); *Hughes v. Owens*, 320 F. App'x 271, 272 (5th Cir. 2009) ("It is axiomatic that because Texas prisoners have no protected liberty interest in parole they cannot mount a challenge against any state parole review procedure on procedural (or substantive) Due Process grounds." (citation omitted) (internal quotation marks omitted)); *Grennier v. Frank*, 453 F.3d 442, 446 (7th Cir. 2006) (holding that there is no "liberty or property interest in the prospect of parole under Wisconsin's discretionary system" and therefore no due process right to hearing before parole board may consider failure of inmate not convicted of sex offense to participate in sex offender treatment).

¶ 37    Mr. Neese has adduced no contrary authority; each of the cases that Mr. Neese cites for the proposition that the federal Due Process Clause entitles inmates to procedural protections before they

may be classified as sex offenders first found a protected liberty interest based on an underlying *statutory entitlement* to release that the sex offender classification jeopardized. *See, e.g.*, *Coleman v. Dretke*, 395 F.3d 216, 225 (5th Cir. 2004) (holding that parolees have protected liberty interest in not being *required* to participate in sex offender treatment); *Gwinn v. Awmiller*, 354 F.3d 1211, 1217 (10th Cir. 2004) (holding that classification as sex offender that, by operation of law, reduced rate at which inmate could earn good time credits interferes with protected liberty interest); *Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997) (holding that inmate's protected liberty interest is implicated when "State's regulations render the inmate *completely ineligible* for parole [to which the inmate is otherwise statutorily entitled] if the [sex offender] treatment program is not satisfactorily completed").

¶ 38 We acknowledge that in *Sandin v. Conner*, the United States Supreme Court retreated somewhat from the view that statutory and regulatory entitlements are necessary or sufficient to create protected liberty interests, and that *Sandin* instead urged courts to focus on the functional questions whether a parole or correctional decision has imposed an "atypical and significant hardship" on the inmate or "will inevitably affect the duration of [the] sentence." 515 U.S. at 484, 487. But federal circuit courts that have considered whether, after *Sandin*, inmates in discretionary sentencing schemes have any protected liberty interest in early release have uniformly concluded that they don't. *See, e.g.*, *Jenner v. Nikolas*, 828 F.3d 713, 717 (8th Cir. 2016) (*Sandin* doesn't change the rule that absent a statutory right to parole there's no "protected liberty interest" for purposes of Due Process Clause); *Duemmel v. Fischer*, 368 F. App'x 180, 182 (2d Cir. 2010) (holding that an inmate in discretionary parole system not entitled to due process before participation in sex offender treatment made a prerequisite for parole eligibility because, absent indication that inmate enjoys a "presumption of parole release," no indication that the requirement "will inevitably affect the duration of his sentence" (quoting *Sandin*, 515 U.S. at 487)); *Michael v. Ghee*, 498 F.3d 372, 378 (6th Cir. 2007) (noting that "*Sandin* was decided only in the context of prison conditions, not parole eligibility" and concluding that an inmate "under a discretionary parole system" has no protected liberty interest (quoting *Swihart v. Wilkinson*, 209 F. App'x 456, 458–59 (6th Cir. 2006))); *McQuillion v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002) ("*Sandin* does not deal with a prisoner's liberty interest in parole and does not overrule *Greenholtz* and *Allen*." (citing *Ellis v. District of Columbia*, 84 F.3d 1413, 1417–18

(D.C. Cir. 1996))); *Ellis*, 84 F.3d at 1418 ("Until the Court instructs us otherwise, we must follow *Greenholtz* and *Allen* because, unlike *Sandin*, they are directly on point. Both cases deal with a prisoner's liberty interest in parole; *Sandin* does not. And so we return to the language of the regulations."); *Orellana v. Kyle*, 65 F.3d 29, 32 (5th Cir. 1995) (*Sandin* doesn't change the fact that because inmates "ha[ve] no liberty interest in obtaining parole in Texas['s discretionary parole system], [they] cannot complain of the constitutionality of procedural devices attendant to parole decisions.").

¶ 39 So the Parole Board is likely right that Mr. Neese doesn't presently enjoy a federally protected liberty interest in parole. But the federal cases don't support the Parole Board's contention that *Labrum* sets the ceiling for state due process protections, and they're curious cases to press into that service. Instead, if the logic of these cases applied under Utah's Constitution, we'd have to overrule *Labrum* and hold that our constitution requires the same "liberty interest" analysis that the federal courts employ. But the Parole Board doesn't ask us to overrule *Labrum*, and, even more importantly, we believe that *Labrum* got it right: being kept in prison, potentially for decades longer than one otherwise would, is a paradigmatic example of a deprivation of liberty. Moreover, to the extent that the Parole Board asks us to conclude that *Labrum* is confined to its facts, we decline the invitation. The Parole Board has given us no cause to repudiate the reasoning of *Labrum*, and our task is to faithfully apply our precedent. We adhere to *Labrum* absent any argument or indication that it should be overruled. *See State v. Steed*, 2015 UT 76, ¶ 11 n.9, 357 P.3d 547 ("We should tread cautiously in overruling precedent and this is especially true where the parties have failed to brief or even argue that a particular precedent should be overruled." (citation omitted)).

¶ 40 Based on *Labrum*'s framework and the undisputed facts (1) that Mr. Neese has never been adjudicated a sex offender in any proceeding and (2) that the Parole Board nonetheless determined that he'd committed a sex offense and thus took his refusal to participate in sex offender treatment into consideration as a factor bearing on whether he should be released, we conclude that Mr. Neese was entitled to greater due process protections than he received.

## II. THE ADDITIONAL PROCEDURAL PROTECTIONS
## TO WHICH MR. NEESE IS ENTITLED

¶ 41  Among the crucial elements of due process under article I, section 7 of the Utah Constitution are "notice to the person of the inauguration and purpose of the inquiry and the time at which such person should appear if he wishes to be heard," the "right to appear in person or by counsel," and a "fair opportunity to submit evidence." *Christiansen v. Harris*, 163 P.2d 314, 317 (Utah 1945). In this case, we're, in large measure, concerned with an inmate's opportunity to submit evidence when seeking to challenge a charge that he or she has committed an entirely new sexual offense.

¶ 42  In *Wolff v. McDonnell*, 418 U.S. 539 (1974), the United States Supreme Court considered what procedures the federal Due Process Clause required prison officials to provide inmates in the closely related context of prison disciplinary proceedings. It held that inmates in disciplinary proceedings were entitled to (1) "advance written notice of the claimed violation," (2) the ability to "call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals," and (3) a "written statement of the factfinder[] as to the evidence relied upon and the reasons for the disciplinary action taken." *Id.* at 563, 566. When a federal liberty interest is implicated, federal courts have similarly adopted these protections in proceedings where a parole board intends to classify inmates as sex offenders and require them to complete sex offender treatment as a precondition for parole eligibility. *See, e.g.*, *Neal v. Shimoda*, 131 F.3d 818, 830 (9th Cir. 1997).

¶ 43  We hold today that the Utah Constitution requires analogous procedures in original parole grant hearings where the Parole Board intends to classify as a sex offender an inmate who has never been convicted of a sex offense or otherwise adjudicated a sex offender. That is, the Parole Board (1) must, in advance of the hearing, provide particularized written notice that it intends to consider and effectively decide unconvicted sexual conduct in making its parole determination; (2) unless the safe administration of the prison system requires otherwise, it must allow the inmate to call witnesses and present documentary evidence in his defense; and (3) it must provide a written statement of the evidence it relied upon and the reasons it concluded that the inmate committed the unconvicted sexual conduct.

¶ 44   These procedures will redress the due process problems that we've identified with the Parole Board's considering unconvicted sexual conduct in this case. Particularized, advance written notice and the ability to call witnesses will reduce the risk of error and promote the perception of fairness by allowing inmates to meaningfully present evidence in a situation where they've never before had the opportunity to do so. The requirement that an inmate receive particularized written notice flows directly from *Labrum*'s holding that inmates must be given "the materials and information on which the [Parole] Board [intends to] rel[y] at an original parole grant hearing." *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 909 (Utah 1993). This right of access extends broadly to give the inmate the opportunity to review and prepare to address any information on which the Parole Board intends to rely. For example, notwithstanding the confidential nature of psychological reports, an inmate is presumptively "entitled to access psychological reports to be considered by the [Parole] Board in hearings at which the inmate's release date may be fixed or extended." *Neel v. Holden*, 886 P.2d 1097, 1103 (Utah 1994). Thus, when the Parole Board plans to consider unadjudicated allegations of sexual misconduct, an inmate must be given particularized written notice of the nature of those allegations sufficiently in advance of the hearing to allow him to prepare a defense.

¶ 45   An inmate who stands accused of committing an unconvicted sexual offense must also be allowed to call witnesses. To be sure, the ability to call witnesses isn't essential to the fairness and accuracy of all original parole proceedings. But when the Parole Board considers unconvicted sexual conduct, these procedural protections are "basic to a fair hearing." *Wolff*, 418 U.S. at 566. This is because the Parole Board, in considering unconvicted sexual conduct, is effectively trying the inmate for an offense that has never before been adjudicated in any other forum (criminal trial, sentencing proceeding, or prison disciplinary hearing). It would be anomalous to allow the Parole Board to effectively convict an inmate of a sexual offense— effectively adding decades to his sentence and placing him in the impossible bind of having to participate in a treatment program he can't honestly engage in—without first giving the inmate the opportunity to put on testimony.

¶ 46   Similarly, a written statement of the evidence relied upon and the reasons that the Parole Board concluded that the inmate committed the unconvicted sexual conduct will promote fairness and accuracy,

both by ensuring that the Parole Board has carefully considered the evidence and by creating a record of the Parole Board's adjudication that allows for meaningful due process review. *Cf. Preece v. House*, 886 P.2d 508, 512 (Utah 1994) (courts may review only "the *process* by which the [Parole] Board undertakes its sentencing function" (citation omitted) (internal quotation marks omitted)). This is particularly important when the Parole Board is, in effect, holding a miniature criminal trial—a proceeding that, more so than the ordinary functions of the Parole Board (reviewing disciplinary, court, criminal, family, and victim history and impact records and making a determination regarding early release) is squarely within the judiciary's ken. A preprinted form with aggravating and mitigating factors checked off on it *presupposes* that an inmate has committed a sexual offense; it doesn't explain that conclusion. And it's therefore inadequate.

¶ 47 The procedures we require today will also further other important interests. First, they'll eliminate the irrational disparity otherwise created by the fact that inmates in disciplinary proceedings— where the potential sanctions are often much less severe than extra years, decades, or life in prison—are entitled to *Wolff*'s procedural protections, whereas inmates are not entitled to *Wolff*'s procedural protections when the Parole Board is sitting in an analogous capacity by adjudicating an inmate's guilt or innocence of an offense for which he's not otherwise been found guilty. *See Wolff*, 418 U.S. at 563; *Homer v. Morris*, 684 P.2d 64, 67 (Utah 1984) (inmates have "due process rights in a prison disciplinary proceeding for alleged 'flagrant or serious misconduct'" (quoting *Wolff*, 418 U.S. at 555–56)). Second, they'll promote rationality in sentencing by ensuring that the Parole Board has the benefit of adversarial testing in deciding whether an inmate has committed unconvicted sexual conduct. *See Labrum*, 870 P.2d at 908. Finally, we don't believe that these additional procedural protections are unnecessarily onerous (given that *Wolff* has applied these protections in disciplinary proceedings for years without needless disruption of the correctional system) and, to the extent that they reduce the Parole Board's reliance on unconvicted sexual conduct, especially conduct that has been bargained out of a plea deal, they'll safeguard the rationality of plea bargaining. *See id.*

¶ 48 We accordingly hold Mr. Neese was entitled to the procedural protections this opinion outlines before the Parole Board could designate him a sex offender based on previously unadjudicated allegations of sexual misconduct.

### III. THE DISSENT

¶ 49 The dissent believes Mr. Neese has already received more process than he's entitled to under the due process provision. According to the dissent, the framers of the Utah Constitution would have never understood the mandates of due process to extend beyond the guilt phase of a criminal proceeding. A consequence of this is that due process protections simply do not apply to sentencing—a view that, if taken seriously and to its logical conclusion, would mean that "heads you live/tails you die" sentencing doesn't offend due process in this state. And, even if the protections of due process do extend to parole proceedings, the dissent thinks Mr. Neese has received all due process requires and then some. After all, he'd been told of the parole hearing and given an opportunity to speak. He even received the packet of information on which the Parole Board relied in denying him parole.

¶ 50 We reject the dissent's analysis for two reasons. First, it can't be squared with the kind of fidelity to *Labrum* and its progeny that our commitment to the principles of *stare decisis* requires. Second, it rests exclusively on the dissent's potentially incomplete review of some sources bearing on the original meaning of article I, section 7 of the Utah Constitution. *See Griffin v. United States*, 502 U.S. 46, 60 (1991) (Blackmun, J., concurring in the judgment) (declining to "follow the Court on its . . . tour of the common law").[5]

¶ 51 These considerations apply with particular force here because no party asked us to overrule *Labrum* or to confine it to its facts on the basis that it's inconsistent with the original meaning of article I, section 7 of the Utah Constitution. *See Munson v. Chamberlain*, 2007 UT 91, ¶ 21, 173 P.3d 848 (overruling the last paragraph of an opinion because it resolved a question without the "benefit [of] any adversarial briefing of the issue"); *see also St. Jeor v. Kerr Corp.*, 2015 UT 49, ¶ 14, 353 P.3d 137 ("'[W]e would be ill-advised' to reach a decision regarding unsettled law 'without the benefit of adversarial briefing.'" (citation omitted)).

---

[5] The dissent repeatedly claims safe harbor to launch its assault on *Labrum* and to undertake its independent originalist analysis based upon our decision not to seek supplemental briefing. If played out to its logical end, the dissent's argument would allow any justice to write on any argument at any time because the court could have, but didn't, request supplemental briefing. We respectfully reject any such notion.

Appellate courts have no business unsettling the law by overturning significant precedent where the parties have not asked the court to do so, nor been provided with an opportunity to brief the issue, nor (needless to say) carried their burden of persuasion to show us that the precedent should be overturned.

¶ 52 With this backdrop in mind, our response to the dissent proceeds in four parts. First, we explain why the dissent's approach to *Labrum* is inconsistent with our *stare decisis* principles.[6] Second, we illustrate the problem with reaching out to resolve an issue that hasn't been briefed to us by giving reasons to question the dissent's originalist analysis—its analysis of the original understanding of both the *scope* of due process and its *content*. Third, we diagnose a fundamental methodological mistake that we believe the dissent's originalist analysis commits. Finally, we close with some reflections on the relationship between originalism and policy analysis.

### A. Labrum *and Stare Decisis*

¶ 53 We've already explained why *Labrum* requires that Mr. Neese receive additional procedural protections—the right to particularized notice, to call witnesses, and to a fuller written explanation of the Parole Board's decision—before the Parole Board may, in effect, extend Mr. Neese's term of incarceration based on untested allegations that he committed a sex offense unrelated to the reasons for his incarceration. *Supra* ¶¶ 25–34. Under *Labrum*, "original release hearings . . . are analogous to sentencing hearings and require due process to the extent that the analogy holds." *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 908 (Utah 1993); *see also supra* ¶¶ 27, 46. *Labrum* requires that we balance the goals of (1) minimizing errors in the Parole Board's sentencing process and (2) promoting the perception of fairness with (3) ensuring the effective administration of Utah's prison and parole systems. *Labrum*, 870 P.2d at 909–10; *see also supra* ¶ 28.

¶ 54 In the ordinary case, the Parole Board makes its decision based on considerations such as a review of an inmate's criminal,

---

[6] In response, the dissent makes much of Mr. Neese not citing to *Labrum* in his opening brief. *See infra* ¶ 129. That is a fair criticism, but one that sidesteps the fact that (1) Mr. Neese did make the underlying state due process argument in his initial brief and (2) the State extensively briefed *Labrum* in response, as did Mr. Neese on reply.

psychological, social, and carceral history. The Parole Board examines the crimes of which the inmate has already been adjudicated, the inmate's network of social support, his disciplinary, social-programmatic, and work record in prison, and (if pertinent) uncontested therapeutic opinions of the inmate's psychologist or therapist. When this is the extent of the Parole Board's review, it need not allow an inmate to call witnesses because witnesses won't meaningfully reduce the risk of error or promote the perception of fairness. Instead, it's sufficient to give an inmate the opportunity to review the records on which the Parole Board intends to rely, to afford the inmate an opportunity to speak, and to provide a brief written summary of the factors the Parole Board considered in setting the inmate's release date. *Labrum*, 870 P.2d at 904; *see also Padilla v. Utah Bd. of Pardons & Parole*, 947 P.2d 664, 670 (Utah 1997) (reviewing the constitutional adequacy of "rationale sheets used by the [Parole] Board to explain its parole decision"). This is because to correct errors or inaccuracies in the Parole Board's records, the inmate need only (1) have the opportunity to review those records and (2) be allowed to point them out to the Parole Board. *Labrum*, 870 P.2d at 909–10 (focusing on the problem of "substantial inaccuracies in inmate files . . . 'I have seen black men listed as white and Harvard graduates listed with borderline IQ's'" (quoting *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 33 & n.15 (1979) (Marshall, J., dissenting)). The written rationale sheet, in turn, gives the inmate the opportunity to make sure the Parole Board has heeded his corrections—and it gives courts the opportunity to review arbitrary and capricious decisions to rely on inaccuracies that the inmate may have already pointed out.

¶ 55   But *Labrum* requires more when the Parole Board goes beyond its usual role and, instead, bases its decisions on untested allegations that an inmate has committed a sex offense. In such a situation, the Parole Board is sitting not just as a sentencing tribunal, but as a trier of fact. *Cf. Labrum*, 870 P.2d at 908; *see supra* ¶ 29. Fairness and the minimization of error thus require more than simply giving the inmate an opportunity to speak and "point out errors" in his file. *Labrum*, 870 P.2d at 909 (citation omitted). Particularized, advanced written notice of the alleged sex offense is crucial to allowing an inmate a fair opportunity to prepare and be heard; witnesses are crucial to determining whether a person has committed such an offense; and an explanation of the Parole Board's decision is crucial for our reviewing its criminal fact-finding. *See supra* ¶¶ 44–47.

¶ 56 The dissent disagrees. It acknowledges that *Labrum* "deserves some measure of respect as a matter of *stare decisis*." *Infra* ¶ 125. But the dissent thinks it can square its preferred result with upholding *Labrum*. The dissent accuses us of beginning with "the broadest conception of our opinion in *Labrum*" and then extending its "premises . . . to their logical extreme." *Infra* ¶ 125. Before we apply *Labrum*'s theory to Mr. Neese's case, the dissent contends "we should carefully consider the basis of the court's analysis in *Labrum*." *Infra* ¶ 125. Because the dissent finds this basis wanting, it tells us to confine *Labrum* to its precise facts, *see infra* ¶ 166 (arguing against "*extend*[ing] [*Labrum*] further" based on the dissent's view that *Labrum* was wrongly decided).

¶ 57 The dissent's stated approach—confine *Labrum* to its facts on the grounds that *Labrum* was wrongly decided—doesn't respect *stare decisis*. It's treating it like a velvet Elvis—hiding the opinion in the attic and exhibiting it only to subject it to derision. Respect for past opinions demands more. *Stare decisis* is "a cornerstone of Anglo-American jurisprudence that is crucial to the predictability of the law and the fairness of adjudication." *State v. Thurman*, 846 P.2d 1256, 1269 (Utah 1993) (citation omitted). A fundamental requirement of *stare decisis* is that we not "overrule our precedents lightly." *State v. Guard*, 2015 UT 96, ¶ 33, 371 P.3d 1 (citation omitted) (internal quotation marks omitted). We thus don't overrule our precedents unless they've proven to be unpersuasive and unworkable, create more harm than good, and haven't created reliance interests. *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 22, 345 P.3d 553; *Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶¶ 16–17, 275 P.3d 208 ("[W]e may overturn our precedent [when] more good than harm will come by departing from precedent" and the precedent "is simply unworkable in practice." (citation omitted) (internal quotation marks omitted)); *see also Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 92, 361 P.3d 63 (Lee, A.C.J., dissenting) ("Unless and until our decisions become unworkable . . . they are worthy of respect.").

¶ 58 And transparency in the decision-making process and respect for our precedent require more than a bare, technical refusal to overrule. "[L]aying just claim to be honoring *stare decisis* requires more than beating [precedent] to a pulp and then sending it out to the lower courts weakened, denigrated, more incomprehensible than ever, and yet somehow technically alive." *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 636 (2007) (Scalia, J., concurring in the judgment); *see also* Geoffrey R. Stone, *The Roberts Court, Stare Decisis, and the Future of*

*Constitutional Law*, 82 TUL. L. REV. 1533, 1534 (2008). In short, respect for *stare decisis* requires us to "extend a precedent to the conclusion mandated by its rationale." Richard L. Hasen, *Anticipatory Overrulings, Invitations, Time Bombs, and Inadvertence: How Supreme Court Justices Move the Law*, 61 EMORY L.J. 779, 780 (2012) (citation omitted).

¶ 59 The dissent doesn't even attempt to explain how *Labrum*'s principles are consistent with denying Mr. Neese the due process protections he seeks. Instead, the dissent simply tells us to confine *Labrum* to its facts on the grounds that *Labrum* got it wrong. *Infra* ¶¶ 125, 166. This is not a faithful application of our precedent; rather, it is "fail[ing] to extend a precedent to the conclusion mandated by its rationale." Hasen, *Anticipatory Overrulings, supra*, at 780 (citation omitted). It's also not how we should do business. We're an adversarial court that ought not upend our precedents absent argument from the parties that they be overruled. *See State v. Steed*, 2015 UT 76, ¶ 11 n.9, 357 P.3d 547 (The concurrence argues "that we should overrule *McBride*. We decline to do so, however, because neither party has asked us to overrule the case nor argued that it applies in the manner that [the concurrence] suggests." (citation omitted)); *see also supra* ¶ 39. Absent a persuasive invitation to overrule our precedents, we give them a full and fair application to the facts before us.

¶ 60 Here, *Labrum*'s full measure commands that we extend additional procedural protections to an inmate, like Mr. Neese, whom the Parole Board seeks to adjudicate a sex offender based solely on previously unadjudicated allegations that he's committed a sexual offense. *Labrum* rested on the proposition that "original release hearings"—such as the hearing at issue here—"are analogous to sentencing hearings and require due process to the extent that the analogy holds." *Labrum*, 870 P.2d at 908. The corollary of this proposition is that this court must announce "procedural safeguards . . . to ensure the accuracy and fairness of [Parole] Board decisions in original parole grant hearings." *Id.* at 912; *see id.* at 910 ("Accuracy and fairness are essential in proceedings which impinge as directly on personal liberty as original parole grant hearings."). As we've explained, a faithful application of this framework requires providing inmates the opportunity to call witnesses and requires the Parole Board to explain its decision when it decides to consider unadjudicated allegations of sexual misconduct in setting an inmate's sentence. *Supra* ¶¶ 25–34.

¶ 61 The dissent would have us provide only the specific procedural protections that *Labrum* required—not additional protections based on application of the *Labrum* framework, which the dissent fairly characterizes as *Labrum's* "premises." *Infra* ¶ 125. These premises are the rationale of the decision, the engine that drives the *Labrum* machine. "For all intents and purposes, adoption of [Utah's] indeterminate sentencing system transformed the [Parole] Board from an agency having the ability to shorten a prisoner's judge-determined sentence into an agency with power analogous to that of a court to actually impose a sentence. Therefore," we've held, "the [Parole] Board's decision of whether to grant parole does implicate the offender's liberty interest because at the time an offender first comes before the [Parole] Board, no term of incarceration has been fixed." *Neel v. Holden*, 886 P.2d 1097, 1101 (Utah 1994). "[B]y acknowledging . . . that the parole function is a complex, multi-dimensional proceeding *which includes sentencing*, we have opened the door to a more extensive review of the constitutional adequacy of procedures that the [Parole] Board, and probably the legislature, would prefer to exclude from such review." *Padilla*, 947 P.2d at 669 (quoting *Labrum*, 870 P.2d at 911).

¶ 62 *Labrum's* rationale has thus set the terms of analysis that this court has used to analyze the due process protections to which inmates at an original parole grant hearing are entitled. Based on the analogy between original release hearings and sentencing proceedings, we've held that an inmate "is entitled to access psychological reports to be considered by the [Parole] Board in hearings at which the inmate's release date may be fixed or extended." *Neel*, 886 P.2d at 1103. In reaching this decision, we drew on the rationale underlying defendants' rights to information in connection with sentencing proceedings. *See id.* ("This rationale [drawn from sentencing decisions] guides our decision in the present case."). We also "grounded" our holding "on concerns about [ensuring] the factual accuracy of the information contained in the [Parole] Board's files." *Id.* at 1102 (citation omitted). And we held—as we do here—that this procedural right was not unlimited: "due process does not require the disclosure of confidential information when that disclosure might lead to harm of a third person." *Id.* at 1103 (citation omitted).

¶ 63 *Labrum* also sets the terms of our analysis when we reject inmates' arguments for additional procedural protections. In *Monson v. Carver*, 928 P.2d 1017 (Utah 1996), for example, while we agreed that inmates were entitled to test the accuracy of a restitution order, we held

that an inmate was not allowed to call character witnesses because the inmate had not shown that the proffered testimony had "anything to do with substantially furthering the accuracy and reliability of the [Parole] Board's fact-finding process." *Id.* at 1030. We likewise refused the inmate's request for a lawyer on the grounds that he'd "failed to show how the 'participation of counsel at the hearing would have affected the accuracy of the information considered by the [Parole] Board.'" *Id.* (quoting *Neel*, 886 P.2d at 1103). In each case, we explained that our holding rested on the basic premise that "if an inmate fails to demonstrate how a particular procedural requirement will substantially further the [Parole] Board's fact-finding process, we have no basis for concluding that a failure to provide that procedure operated to deny the inmate due process." *Id.* (citation omitted).

¶ 64  If we were to follow the dissent's lead, we'd undercut the foundations of this entire line of cases. Their discrete procedural protections would remain, but there would be no coherence to those protections, and the Parole Board, the lower courts, and future litigants would be left without guidance on how to reason about our precedent in this field. Depending on the specific composition of this court, those precedents would either have new life breathed into them or they would come in for repeated, sustained criticism, until, one day, they found themselves overruled.

¶ 65  This can't be what respect for *stare decisis*—indeed, respect for the rule of law—allows. "If this Court is to decide cases by rule of law rather than show of hands, we must surrender to logic and choose sides . . . ." *Hein*, 551 U.S. at 618 (Scalia, J., concurring in the judgment). As nobody has asked us to overrule *Labrum* and its progeny, much less met the heavy burden of showing that they ought to be overruled, we must apply them fairly, according not just to their specific dispositions, but to the underlying logic they embody. This is what our opinion today does.

### B. The Original Meaning of Due Process

¶ 66 Our commitment to *stare decisis* and resolving disputes according to the adversarial process thus counsels against discarding *Labrum* and reaching for the original meaning of the due process provision. And, ironically, the dissent's own originalist analysis underscores the wisdom of our historiographical restraint. Without the benefit of adversarial briefing, the dissent makes two historical claims: (1) that, on its original understanding, the due process provision likely

wouldn't have been understood to apply to sentencing or parole proceedings, *infra* ¶¶ 165–66; and (2) that, even if it did, Mr. Neese received all the process he was entitled to under the original understanding of the due process provision, *infra* ¶¶ 170–73.

¶ 67 We agree with the dissent that this court should look to the original meaning of the Utah Constitution when properly confronted with constitutional issues. But we don't think we should revisit our precedent without prompting from the parties and based exclusively on our own review of ratification-era common law and other historical sources. "The lack of adversarial briefing on the issues explored . . . is troubling." *Meza v. State*, 2015 UT 70, ¶ 40, 359 P.3d 592 (Lee, A.C.J., concurring in part and concurring in the judgment). To show the problem with exploring these issues without the benefit of adversarial briefing, we take this opportunity to illustrate how the dissent's historiography may be incomplete.[7]

1. The Original Scope of Due Process: Sentencing and Parole

¶ 68 The dissent begins by questioning whether, on the original understanding of the due process provision, due process protections would have been understood to apply to post-trial proceedings, such as sentencing proceedings and parole hearings.

¶ 69 The heart of the dissent's historical case is the supposed absence of Reconstruction and Gilded Age case law applying due process protections to discretionary sentencing proceedings. The dissent sees in this absence "an important 'dog that didn't bark'"—"[i]f the generation of the framing of the Utah Constitution viewed the constitutional guarantee of due process of law to attach to sentencing proceedings, surely," the dissent suggests, "someone would have raised the argument." *Infra* ¶ 163. And the dissent thinks it knows why due process didn't apply to these proceedings (or, later, to early parole proceedings). Any sentence less than the statutory maximum—and any decision by a parole board to release an inmate early—was "an act of

---

[7] In his opinion concurring in part and dissenting in part, the Chief Justice suggests that in highlighting why we believe the dissent's historical analysis may be incomplete, we have somehow put "a thumb on the scale." *Infra* ¶ 118. That is not our intent and we disavow any language that might suggest otherwise.

grace—a grant of greater liberty than the defendant was entitled to." *Infra* ¶ 164 (footnote omitted).

¶ 70   We're hesitant to come to any definite conclusions about this history without the benefit of adversarial briefing. And our own independent review of the historical record illustrates why. When we examine the historical record, we don't see as clearly as the dissent a settled view that due process protections didn't apply to sentencing or parole proceedings. On this point, the dissent's historical review falls short in three respects: (a) it overlooks a body of law that appears to apply procedural protections to sentencing, (b) it overlooks plausible competing explanations for why courts didn't address sentencing due process questions more frequently than they did, and (c) its attempt to explain why due process might not have been thought to extend to sentencing proceedings—because Gilded Age penologists were in the grips of a "grace" conception of sub-maximum sentencing and parole—may be historically inaccurate.

> a.   Examples from the body of eighteenth- and nineteenth-century cases that applied procedural protections to sentencing

¶ 71   Contrary to the dissent, it appears to us that the reports may contain notable examples of cases that applied procedural protections to sentencing proceedings.[8] For the contrary view, the dissent relies heavily on *Williams v. New York*, 337 U.S. 241 (1949). Relying on *Williams*, the dissent tells us that "historically, 'strict evidentiary procedural limitations' governed proceedings where the 'question for consideration [was] the guilt of the defendant,' but during sentencing, a judge was not 'hedged' by procedural rules and 'could exercise a wide discretion.'" *Infra* ¶ 159 n.36 (alteration in original) (quoting *Williams*, 337 U.S. at 245–46); *see also infra* ¶ 161 ("The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure." (quoting *Williams*, 337 U.S. at 251)); *infra* ¶ 171 n.52 ("We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were

---

[8] What *does* appear to be absent from the reports are any cases in which a sentencing body based its sentence on a determination that the defendant had committed a hitherto unadjudicated, unadmitted criminal offense. This suggests to us that such a basis might well have been thought to run afoul of basic constitutional norms.

restricted to that given in open court by witnesses subject to cross-examination." (quoting *Williams*, 337 U.S. at 250)).

¶ 72  *Williams*, in turn, relied on *State v. Reeder*, 60 S.E. 434 (S.C. 1908). It appears to us, however, that *Reeder* and the cases on which it relied may stand for the proposition that sentencing judges must *adhere* to norms of due process when settling on a sentence. The issue in *Reeder* was whether the sentencing court should have accepted into evidence affidavits "tending greatly to aggravate the crime." 60 S.E. at 435. The *Reeder* court held that these affidavits were admissible at sentencing. But it based this holding *not* on the absence of procedural protections at sentencing, but rather on its view that due process *requires* sentencing courts to receive a wide range of reliable information:

> The American cases lay down the principle that, where it devolves upon the court to determine the punishment either upon the finding or upon the plea of guilty, it is the *correct practice* for it to hear evidence in aggravation or mitigation, as the case may be, where there is any discretion as to the punishment. It has likewise been held that evidence of the moral character of the accused is competent to guide the court in determining the punishment to be imposed.

*Id.* (emphasis added) (citations omitted).

¶ 73  The cases on which *Reeder* relies may also stand for the proposition that procedural protections apply at sentencing. *Reeder* was a follow-up case to a much earlier South Carolina case: *State v. Smith*, 2 S.C.L. (2 Bay) 62 (S.C. Ct. Const. App. 1796). The issue in *Smith* was whether the defendant should have been allowed to submit mitigating evidence to the sentencing court. *Id.* at 62–63. The Constitutional Court of Appeals of South Carolina held that the sentencing court had erred in excluding that mitigating evidence. It held that defendants must be allowed to submit mitigating evidence "on affidavits, a reasonable time before sentence is pronounced." *Id.* It further elaborated substantial procedural protections for defendants at sentencing, holding that

> in order to guard against a failure of justice, by the non-attendance of witnesses to give testimony of such extenuating circumstances as a defendant may be desirous of submitting to the court on the sentence day . . . a defendant [is] entitled to a subpoena, as a matter of

right, to compel the attendance of witnesses on such
occasions, as well as on trials of issues before a jury.

*Id.* at 63. These protections bear a remarkable resemblance to those we
provide Mr. Neese today.

¶ 74 The other cases on which *Reeder* relied likewise appear to
potentially recognize the importance of procedural protections in
connection with sentencing. In *Kistler v. State*, for example, the Supreme
Court of Indiana held that the court had erred in failing to allow the
defendant to "make . . . proof" of mitigating evidence, as well as
evidence of his good character, at trial. 54 Ind. 400, 403 (1876). It based
this decision on Indiana's cruel and unusual punishments clause, its
proportionate punishment provision, and "the principles of natural
justice and of an enlightened public policy." *Id.* Similarly, in *People v.
Vermilyea*, Chief Justice Savage stated that a sentencing court must be
allowed to consider "the circumstances *in evidence*" in meting out
punishment—implying that circumstances *not* properly in evidence
couldn't be considered. 7 Cow. 108, 143 (N.Y. Sup. Ct. 1827) (emphasis
added).[9]

---

[9] Each of these cases is also notable for its insistence—really
presupposition—that all evidence before a sentencing court must be
sworn. *See State v. Reeder*, 60 S.E. 434, 435 (S.C. 1908) ("[I]t is the correct
practice for [the court] to hear *evidence* in aggravation or mitigation, as
the case may be, where there is any discretion as to the punishment."
(emphasis added)); *Kistler v. State*, 54 Ind. 400, 403 (1876) (court must
"hear evidence in aggravation or mitigation . . . where there is any
discretion as to the punishment"); *People v. Vermilyea*, 7 Cow. 108, 143
(N.Y. Sup. Ct. 1827) (requiring sentencing courts to consider "the
circumstances in evidence"); *State v. Smith*, 2 S.C.L. (2 Bay) 62, 62–63
(S.C. Const. Ct. App. 1796) ("[A]ll such extenuating circumstances
should be submitted to the court, *on affidavits*, a reasonable time before
sentence is pronounced." (emphasis added)). It's hard to overstate the
crucial importance that the eighteenth and nineteenth centuries placed
on the power of oaths to assure the reliability of evidence. *See, e.g.*, 1
SIMON GREENLEAF, A TREATISE ON THE LAW OF EVIDENCE 377 (Boston,
Little & Brown 1842) ("[O]ne of the main provisions of the law, for the
purity and truth of oral evidence, is, that it be delivered under the
*sanction of an oath*. Men in general are sensible of the motives and
restraints of religion, and acknowledge their accountability to that

(cont.)

¶ 75 So, contrary to the dissent, it appears to us that procedural protections may have been understood to apply to sentencing proceedings in the period leading up to ratification of the Utah Constitution.

¶ 76 And there are other reasons to think that the dissent may have understated the procedural protections courts devised to ensure fairness in sentencing during the eighteenth and nineteenth centuries. The eighteenth and nineteenth centuries were a time that didn't sharply

---

Being, from whom no secrets are hid."); Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1409, 1467 (1990) ("The oath requirement was the principal means of ensuring honest testimony and of solemnizing obligations. At a time when perjury prosecutions were unusual, extratemporal sanctions for telling falsehoods or reneging on commitments were thought indispensable to civil society."). By requiring that the evidence be sworn, these courts placed great weight on ensuring the reliability of evidence in sentencing proceedings. At least one nineteenth-century court expressed concern with a statutory scheme for the commitment of the insane in part on the grounds that it authorized an investigation to be commenced based on "the filing of an information not even sworn to by anybody"—an authorization that, in the court's view, "opened the door to wrong and injustice[,] to the making of very serious and unwarranted charges against others by wholly irresponsible and evil-minded persons." *State ex rel. Blaisdell v. Billings*, 57 N.W. 794, 795 (Minn. 1894). But oaths have largely lost their power today. *See* Albert W. Alschuler, *A Peculiar Privilege in Historical Perspective: The Right to Remain Silent*, 94 MICH. L. REV. 2625, 2632 (1996) ("The coercive power of an oath stemmed partly from its mystic and religious significance, a significance that modern observers may not fully appreciate."). And because of this, we should hesitate to infer from the absence of alternative required procedures for assuring the reliability of evidence that the underlying principles of due process in the eighteenth and nineteenth centuries wouldn't have required alternative procedures in those places where the oath had lost its sway. *Cf. infra* ¶ 153 ("Thoughtful originalists . . . view the constitution—like all law—as consisting of *legal principles* expressed by the *public understanding of its terms*. But they do not foreclose *new applications* of those principles to circumstances unknown to the past.").

distinguish between the guilt phase and the sentencing phase. As a consequence, many trial-level procedural protections may also have functioned as sentencing protections. For example, in *United States v. Wynn*, 11 F. 57 (C.C.E.D. Mo. 1882), an appellate court reduced a defendant's sentence in light of its concern that a constitutional error had infected the *guilt phase* of the defendant's trial. *Id.* at 57–58. And an early New York Court of Appeals case—*Shepherd v. People*—reversed a defendant's *conviction*, and dismissed the criminal case against him, on the basis that his sentence was illegal. 25 N.Y. 406, 406–07 (1862). And the remedy in *Shepherd* was "typical of the early [sentencing appeals] cases." Livingston Hall, *Reduction of Criminal Sentences on Appeal: I*, 37 COLUM. L. REV. 521, 525 n.17 (1937).

¶ 77   The dissent may also underestimate the degree to which jury sentencing prevailed in the nineteenth century. It appears that a comparatively small fraction of eighteenth- and nineteenth-century sentences were truly set by a judge. Thus, scholars have discovered that "[o]nly a small fraction of eighteenth-century criminal trials [at the Old Bailey] were genuinely contested inquiries into guilt or innocence" and that the great majority "were sentencing proceedings"—"[t]he main object of the defense was to present the jury with a view of the circumstances of the crime and the offender that would motivate it to return a verdict within the privilege of clergy, in order to reduce the sanction . . . ." John H. Langbein, *Shaping the Eighteenth-Century Criminal Trial: A View from the Ryder Sources*, 50 U. CHI. L. REV. 1, 41 (1983). This practice also appears to have continued into the nineteenth century. "[F]rom 1800 to 1900, juries imposed sentences in noncapital cases in about half of all the states," and "[a] handful of other states permitted juries in noncapital cases to make sentencing recommendations." Morris B. Hoffman, *The Case for Jury Sentencing*, 52 DUKE L.J. 951, 964 (2003) (citations omitted). Moreover, "[e]ven in those states that invested trial judges with the exclusive power to sentence, their discretion . . . was mostly a mirage. . . . As late as 1870, state legislatures commonly set a specific period of incarceration for each offense." *Id.* at 964–65 (footnote omitted) (citations omitted); *see also* Jenia Iontcheva, *Jury Sentencing as Democratic Practice*, 89 VA. L. REV. 311, 319 & n.40 (2003) (noting the widespread prevalence of jury sentencing and observing that "[e]ven in jurisdictions where no direct jury sentencing existed, determinate sentencing regimes allowed jurors to influence sentencing circuitously . . . by acquitting defendants of some charges, despite clear evidence of guilt"—a practice known as

"pious perjury"). So, to the extent that the nineteenth century was an era of jury sentencing, the absence of appellate cases applying procedural protections to the "sentencing phase" of a criminal proceeding tells us less than we might think about whether due process protections applied at sentencing.[10]

¶ 78   And there's good reason to think due process protections may have applied at sentencing. For example, many appellate courts during the late eighteenth and nineteenth centuries insisted that defendants must be allowed to introduce evidence of their good character. *See, e.g.*, *Reeder*, 60 S.E. at 435; *State v. Hice*, 23 S.E. 357, 357 (N.C. 1895) ("In all cases a person accused of a crime of any grade, whether a felony or a misdemeanor, has a right to offer in his defense testimony of his good character." (citations omitted)); *Remsen v. People*, 43 N.Y. 6, 8 (1870) ("It was error to charge the jury that in any case evidence of good character would be of no avail."). While the historical record is sparse, courts appear to have been well aware that character evidence was often introduced for sentencing purposes, to allow the jury to decide whether it should exercise mercy either through jury nullification or "pious perjury" or through the direct sentencing decisions with which it was entrusted. *See* Michael Coenen, *Of Speech and Sanctions: Toward a Penalty-Sensitive Approach to the First Amendment*, 112 COLUM. L. REV. 991, 1043 n.217 (2012) ("[I]t was not uncommon for English juries—sometimes with the encouragement of their overseeing judges—to commit what Blackstone called 'pious perjury,' deliberately convicting defendants of lesser charges so as to spare them from especially harsh punishments." (citation omitted)); *see also* Daniel D. Blinka, *Character, Liberalism, and the Protean Culture of Evidence Law*, 37 SEATTLE U. L. REV. 87, 123 (2013) ("[T]he character of the accused or the victim, both in the sense of disposition and reputation, was of 'fundamental importance' to juries and judges as they exercised their discretion." (citation omitted)).

¶ 79 In short, we're unconvinced of the dissent's sweeping pronouncement that due process protections didn't apply to

---

[10] *Kistler v. State*, discussed above at paragraph 74, serves as an example of both the intermingling of the guilt and sentencing phases and jury sentencing in the latter half of the nineteenth century. 54 Ind. 400.

sentencings or sentencing proceedings. Before we would be willing to reach this issue we would, at minimum, need guidance from counsel.

b. Competing explanations for why courts didn't address sentencing due process questions more frequently than they did

¶ 80 Even if the dissent is right that there were comparatively few cases applying due process protections to sentencing proceedings in the eighteenth and nineteenth centuries than today, it still wouldn't be obvious to us that this "dog that didn't bark"—or barely barked—authorizes the inference that courts didn't think due process protections extended to sentencing. *Infra* ¶ 163. This is because it appears the dog was, at least, trebly muzzled.

¶ 81 First, there's significant authority for the proposition that appellate courts perceived their jurisdiction over criminal appeals—that is, their authority to even *entertain* challenges to process at trial or sentencing—to be quite limited. For most of the nineteenth century, the United States Supreme Court held that section 22 of the First Judiciary Act of 1789 barred it from exercising appellate jurisdiction over criminal cases, *United States v. More*, 7 U.S. 159, 172–73 (1805), unless a trial court certified a legal question to it under section 6 of the Act of April 29, 1802, *see* Briana Lynn Rosenbaum, *Righting the Historical Record: A Case for Appellate Jurisdiction over Appeals of Sentences for Reasonableness Under 28 U.S.C. § 1291*, 62 HASTINGS L.J. 865, 880–81 (2011) ("[W]hile the Act of 1802 made review of [trial] decisions possible . . . defendants 'had no right to ask for' certificat[ion] to the Supreme Court . . . ." (citation omitted)); *see also* Hoffman, *The Case for Jury Sentencing*, *supra*, at 964 ("Federal courts had virtually no role in the criminal process in the early republic, let alone a sentencing role. Federal criminal law did not begin to become a significant part of the national criminal firmament until Prohibition." (citation omitted)). Similarly, "[a]ppellate review [of criminal matters] in the states remained quite limited well into the mid-1800s. The number of cases heard by state appellate courts remained quite small into the 1900s." 7 WAYNE R. LAFAVE ET AL., CRIM. PROC. § 27.1(a) n.3 (4th ed. 2016) (citation omitted); *see also Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 159 (2000) ("The States . . . did not generally recognize an appeal as of right until Washington became the first to constitutionalize the right explicitly in 1889. There was similarly no right to appeal in criminal cases at common law, and appellate review of any sort was limited and rarely used." (citation omitted) (internal quotation marks omitted)).

¶ 82 This rule of non-reviewability may have been applied with special force in sentencing matters. As Professor LaFave explains, "[t]he traditional position in this country . . . has been that 'once it is determined that a sentence is within the limits set forth in the statute under which it is imposed, appellate review is at an end.'" 6 WAYNE R. LAFAVE ET AL., CRIM. PROC. § 26.3(g) (4th ed. 2016) (citation omitted); *see* Notes and Comments, *Appellate Review of Sentencing Procedure*, 74 YALE L.J. 379, 380 (1964) ("It has long been a uniform policy of federal appellate courts not to consider a sentence within the statutory limits."); *see also Gurera v. United States*, 40 F.2d 338, 340–41 (8th Cir. 1930) ("If there is one rule in the federal criminal practice which is firmly established, it is that the appellate court has no control over a sentence which is within the limits allowed by a statute."). Thus, part of the explanation for any apparent dearth of case law applying procedural rights to sentencing proceedings may well be the rules and norms of criminal appellate practice—which limited review of these proceedings—as opposed to the appellate courts' considered conclusion that due process norms simply didn't apply.

¶ 83 Second, while the evidence is sparse, it appears that there may have been significantly fewer prosecutions, in the nineteenth century than today. *See, e.g.*, Paul J. Larkin, Jr., *Public Choice Theory and Overcriminalization*, 36 HARV. J.L. & PUB. POL'Y 715, 728, 779 (2013) (noting explosive growth in the criminal justice system during the twentieth century). And, when a prosecution did arise, it was often poorly handled; the quality of the prosecution bar in nineteenth-century America was notoriously poor. *See* Robert M. Ireland, *Privately Funded Prosecution of Crime in the Nineteenth-Century United States*, 39 AM. J. LEGAL HIST. 43, 43 (1995) (noting the serious "want of talent within the office of public prosecutor"). To the extent there were fewer prosecutions and more acquittals, this too provides a competing explanation for the comparative dearth of reported appellate sentencing decisions.

¶ 84 Finally—even bracketing the norms against criminal appeals and the comparative dearth of prosecutions in the nineteenth century— the pattern of criminal appeals in the run-up to ratification appears to have been significantly different from today. The dissent thinks it obvious that, had a defendant thought he might enjoy due process rights in a sentencing proceeding, the defendant would surely have "raised" that argument on appeal. *Infra* ¶ 163. But, as we've explained, "there usually was only limited appellate review of criminal

convictions." Thomas Y. Davies, Symposium, *Correcting Search-and-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of "Due Process of Law*," 77 MISS. L.J. 1, 175 (2007). And even when they did have the opportunity to appeal, defendants didn't always have access to appellate counsel. *See Douglas v. California*, 372 U.S. 353 (1963) (recognizing right to counsel on appeal for the first time); *see also* Benjamin H. Barton, *Against Civil Gideon (and for Pro Se Court Reform)*, 62 FLA. L. REV. 1227, 1265 (2010) ("[A]t the time of the passage of the Fourteenth Amendment, there was not a well-established right to appointed counsel. The mid-19th Century was, in fact, a time of court deprofessionalization where in many states there were virtually no requirements for admission to the bar and pro se practice was quite common." (citation omitted)). Moreover, even though "states began to codify existing criminal procedure standards during the mid to late nineteenth century," "criminal procedure remained primarily a judicial rather than legislative matter," which meant that "state courts were rarely called upon to assess the constitutionality of statutes that dealt with criminal procedure"—they could preserve due process through the common law. Davies, *Correcting Search-and-Seizure History*, *supra*, at 175 (citation omitted). Additionally, the formalistic approach of many nineteenth-century courts may have made it far more likely that a criminal appeal would result in a reversal of conviction—not a sentencing review. As Professor Friedman explains:

> Between 1870 and 1900 there are persistent complaints that some state supreme courts behaved as if their chief function was to reverse decisions of their lower courts for technical errors . . . . [E]xcesses in behavior were most striking in criminal appeals. Harwell, the defendant in a Texas case decided in 1886, had been arrested and convicted for receiving stolen cattle. The Texas court reversed, because, among other things, the jury found the defendant "guity" instead of "guilty." . . . The same court, however, magnanimously upheld a conviction of "guily" in 1879, proving that a "t" was less crucial than an "l" in the common law of Texas.

LAWRENCE M. FRIEDMAN, A HISTORY OF AMERICAN LAW 398–400 (2d ed. 1985) (citations omitted). Indeed, according to Professor Friedman, between 1875 and 1887, the Texas Court of Appeals "had reversed 1,604 criminal cases, and affirmed only 882—a margin of almost two to one."

*Id.* at 399 ("In one volume of reports, there were five reversals to every single affirmance."). But this means that the appellate courts had far fewer occasions to redress sentencing errors—they were too busy reversing convictions!

¶ 85 In short, even to the extent the dissent is right about the lack of cases articulating procedural protections applicable to sentencing, the inference it draws from this "dog that didn't bark" ignores potential competing explanations that don't imply that the original understanding of due process didn't extend to sentencing and parole proceedings. We think it would be rash to overturn our precedent, and announce new due process standards under the Utah Constitution, based on a chain of historical inferences that may well be misleading or incomplete, and that certainly haven't been tested by the adversarial process.

c. Grace

¶ 86 A key lemma in the dissent's argument for why due process didn't extend to sentencing and parole proceedings is the idea that a sentence below the statutory maximum—or a grant of parole before an indeterminate term had expired—was thought to be an act of "grace." *Infra* ¶ 164. If true, this theory might help explain why nineteenth-century constitutional actors lacked concern about due process protections in sentencing and parole proceedings: mercy, one might argue, isn't a liberty interest.

¶ 87 Again, however, while we're nervous to fly blind, it appears to us that the dissent may well be mistaken about the prevalence of the "grace" conception of parole. The academic literature supports the notion that parole's progenitors embraced a "medical model of criminality." Julia L. Black, Note, *The Constitutionality of Federal Sentences Imposed Under the Sentencing Reform Act of 1984 after* Mistretta v. United States, 75 IOWA L. REV. 767, 771 n.52 (1990) (quoting JANET SCHMIDT, DEMYSTIFYING PAROLE 4–5 (1977)). On this model, parole was not a matter of grace. Instead, parole determinations "emphasized the role of treatment in helping the criminal to understand the external forces causing his or her 'sickness,'" *id.* at 771 n.51 (quoting SCHMIDT, DEMYSTIFYING PAROLE, at 4). Parole and the indeterminate sentence, Professor Friedman explains, were "based on a simple theory." LAWRENCE M. FRIEDMAN, A HISTORY OF AMERICAN LAW 597 (2d ed. 1985).

> No judge was wise enough to tell when a prisoner would be "cured." Prison officials, on the other hand, had the prisoner in view every day. A criminal should be locked up as long as he was "unfit to be free." He was the "arbiter of his own fate"; he carried "the key of his prison in his own pocket." The indeterminate sentence, then, emphasized the character and background of the offender.

*Id.* But this casts doubt on the dissent's explanation of why procedural protections weren't thought to apply to sentencing and parole proceedings. If those proceedings weren't merely merciful acts of grace, but were, instead, supposed to be responsive to an inmate's prospects for rehabilitation, then it makes little sense for courts to have been unconcerned with the standards that might apply to the ascertainment of those prospects. And today, of course, all parties to a sentencing fully expect reasoned, well thought out Parole Board decisions about when an inmate should be released from prison—not random acts of mercy.

¶ 88 In short, we are not confident in the dissent's originalist analysis of the scope of the due process provision. We don't mean to say that the dissent is *wrong*, only that, in the absence of adversarial briefing on the question, we don't know the answer. We believe the appropriate course is to stay our hand on the question until such time that it's fairly before us.

2. The Original Content of Due Process: What's in a Hearing?

¶ 89 The dissent also has a second line of attack: one focused on the *content* of the due process provision. That is, assuming the due process provision applies to parole proceedings, the dissent thinks it plain that Mr. Neese received all he was entitled to under the original understanding of the due process provision. According to the dissent, the Utah Constitution embodies a conception of due process on which due process is satisfied as long as an inmate receives "notice and an opportunity to be heard." *Infra* ¶ 169. And the dissent thinks Mr. Neese got this: "[h]e was advised of the pendency of the parole hearing and given a chance to present his view on the questions presented." *Infra* ¶ 170 (citation omitted).[11]

---

[11] We perceive some tension between this proposition and the view our dissenting colleague propounded in *In re Adoption of K.A.S. See* 2016

(cont.)

¶ 90 But in surveying the history of due process in the run up to ratification, we don't perceive as clearly as the dissent does that constitutional due process protections required only minimal notice and opportunity to speak. Instead, it appears to us that the United States Supreme Court repeatedly explained during the period leading up to Utah's admission to the Union that due process had bite. It required hearings to be conducted according to those procedures that were "appropriate to the nature of the case." *Davidson v. New Orleans*, 96 U.S. 97, 105 (1877); *see also Hagar v. Reclamation Dist. No. 108*, 111 U.S. 701, 708 (1884) ("It is sufficient to observe here that by 'due process' is meant one which, following the forms of law, is appropriate to the case, and just to the parties to be affected."). And it held that *the courts*, not the legislature, were supposed to decide what was "appropriate to the case" and "just to the parties." *Hagar*, 111 U.S. at 707–08. The propriety of procedures, said the Court, was to be ascertained "by the gradual process of *judicial* inclusion and exclusion"—that is, by judicial review of the fairness of procedures when those procedures were challenged in the courts. *Id.* (emphasis added) (quoting *Davidson*, 96 U.S. at 104).

¶ 91 Applying this framework, the Court didn't hesitate to strike down laws that shortcut fair process. One example is *Chicago,*

---

UT 55, ¶ 82, 390 P.3d 278 (Lee, A.C.J., dissenting) ("L.E.S.'s history [of the original meaning of the due process provision] falls short because it is at far too high a level of generality."). There, Justice Lee surveyed the historical landscape and concluded that—on the prevalent understanding of due process principles at the time the Utah Constitution was enacted—due process required "regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings." *Id.* ¶ 88 (quoting *Murray v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 280 (1855)). It required "a right to notice and a meaningful opportunity to be heard." *Id.* ¶ 90 (citation omitted). Here, however, the dissent argues that a litigant's due process right to "trial according to some settled course of judicial proceedings," *id.* ¶ 88 (citation omitted), his right to "a meaningful opportunity to be heard," *id.* ¶ 90, requires no more than a "chance to present his view on the questions presented." *Infra* ¶ 170. It doesn't appear to us that the opportunity to speak on one's own behalf is equivalent to a "trial" or a "*meaningful* opportunity to be heard." *In re Adoption of K.A.S.*, 2016 UT 55, ¶¶ 88, 90 (Lee, A.C.J., dissenting) (emphasis added).

*Milwaukee and St. Paul Railway Co. v. Minnesota ex rel. Railroad Warehouse Commission*, 134 U.S. 418 (1890). In 1887, the Minnesota legislature—responding to pressures from the Granger Movement (farmers who felt gouged by the railways)—established a "railroad and warehouse commission" empowered to determine whether railroad rates were "unreasonable" or "unequal" and to fix them accordingly. *Id.* at 418, 434–35; *see* James W. Ely, Jr., *The Railroad Question Revisited:* Chicago, Milwaukee & St. Paul Railway v. Minnesota *and Constitutional Limits on State Regulations*, 12 GREAT PLAINS Q. 121, 121 (1992) ("Many midwestern and southern state legislatures enacted so-called Granger laws to control the price charged by railroads and related utilities, such as grain elevators and warehouses."). After the Minnesota Supreme Court held that this commission's decisions weren't subject to judicial review, the Supreme Court granted a writ of error and reversed. *Chi., Milwaukee & St. Paul Ry. Co.*, 134 U.S. at 458–59. This scheme, the Court held, violated due process because "[i]t deprive[d] the company of its right to a judicial investigation, by due process of law, under the forms and with the machinery provided by the wisdom of successive ages for the investigation judicially of the truth of a matter in controversy." *Id.* at 457.

> No hearing is provided for; no summons or notice to the company before the commission has found what it is to find, and declared what it is to declare; *no opportunity provided for the company to introduce witnesses before the commission,*—in fact, *nothing which has the semblance of due process of law . . . .*

*Id.* (emphases added).

¶ 92 State courts behaved similarly. In *State ex rel. Blaisdell v. Billings*, for example, the Minnesota Supreme Court considered whether statutory procedures "relating to the commitment of insane persons to the state hospitals . . . violate the fourteenth amendment to the federal constitution, and are in conflict with a similar article in our state constitution, forbidding that any person shall be deprived of his life, liberty, or property without due process of law." 57 N.W. 794, 794 (Minn. 1894). Under the statute, whenever a probate judge or court commissioner "receive[d] information in writing . . . that there is an insane person in his county needing care and treatment," they were required to deputize two physicians as "examiners in lunacy" to certify whether the person charged with insanity was mentally unsound. *Id.* at 795. Once "satisfied that the person is insane," the court commission or

probate judge had the authority to "commit[] him to the custody of the superintendent of" a mental institution. *Id.*

¶ 93 The Minnesota Supreme Court struck this statute down, holding that

> [t]o the person charged with being insane to a degree requiring the interposition of the authorities and the restraint provided for, there must be given notice of the proceeding, and also an opportunity to be heard in the tribunal which is to pass judgment upon his right to his personal liberty in the future. There must be a trial before judgment can be pronounced, and there can be no proper trial unless there is guarantied the right to produce witnesses and to submit evidence. . . . Any statute having for its object the deprivation of the liberty of a person cannot be upheld unless [these rights are] secured, for the object may be attained in defiance of the constitution, and without due process of law.

*Id.*

¶ 94 It appears to us, then, that the dissent's reconstruction emphasizes only *one* due process theme from Gilded Age courts: the need to ensure flexibility in the procedures that new states must adopt, so as not to stifle the rapid industrial and geographic expansion characteristic of that "quick and active age." *Hurtado v. California*, 110 U.S. 516, 529 (1884). But by myopically focusing on *Hurtado*, a case that foregrounded this theme, and failing to focus on those cases where the Court was more searching in its review of the process before it, the dissent disregards the potential continued vitality of due process protections during the Gilded Age.

### C. The Underlying Error in the Dissent's Originalist Approach

¶ 95 In our view, the dissent's originalist analysis rests on one fundamental error. Before we address that error, we note that we find much to commend in the dissent's approach to originalism. We agree with the dissent that originalist inquiry must focus on ascertaining the "original public meaning" of the constitutional text. *Infra* ¶ 154.

¶ 96 We also agree that to ascertain the original public meaning of the constitutional text, we must ask what principles a fluent speaker of the framers' English would have understood a particular constitutional provision to embody. *See infra* ¶ 154 n.33 ("[T]he predominant

originalist theory" requires seekers of the original meaning to "interpret[] the Constitution according to how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment." (quoting John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 Nw. U.L. Rev. 751, 761 (2009))). *See generally* Keith E. Whittington, *The New Originalism*, 2 Geo. J.L. & Pub. Pol'y 599 (2004) (discussing evolution of originalism from "original intent" originalism to "original public meaning" originalism). This understanding is the original meaning—or meanings—of the constitutional text.

¶ 97  We part ways with the dissent's originalist approach not in its end goal—figuring out what a person steeped in Gilded Age linguistic norms would've understood the constitutional language to express— but in the means appropriate to reaching this goal. In our view, the dissent's application of originalism commits a key methodological error—an error that one scholar has recently called "atomistic translation"—translating the meaning of the constitutional text through a process of "term-for-term . . . substitution." Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 Fordham L. Rev. 935, 941–42 (2015).

¶ 98  The problem is that to understand what principle a fluent speaker of the framers' English would have understood a particular constitutional provision to embody will often—though surely not always—require more than just examining the terms used and seeking to translate those terms into roughly equivalent contemporary English. What is missing from this approach is deep immersion in the shared linguistic, political, and legal presuppositions and understandings of the ratification era.

¶ 99  Linguistically, originalism will often require the constitutional interpreter to "access the semantics and pragmatics available to a competent speaker of American English at the time each provision was framed and ratified." Lawrence B. Solum, Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record 17 (Apr. 26, 2017) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3019494 (The pragmatics will include presuppositions shared by the community of speakers at the time of ratification.); *see also* André LeDuc, *Making the Premises About Constitutional Meaning Express: The New Originalism and Its Critics*, 31 BYU J. Pub. L. 111, 117 (2016) (noting a recent trend within

originalism toward "incorporat[ing] pragmatic import as well as semantic meaning" into the concept of original public meaning). But the semantics and pragmatics of the founding era may well be radically different from contemporary linguistic norms and presuppositions. *See* RHYS ISAAC, THE TRANSFORMATION OF VIRGINIA 1740–1790 5 (1999) ("Whether one moves away from oneself in cultural space or in historical time, one does not go far before one is in a world where the taken-for-granted must cease to be so . . . . Ways must be found of attaining an understanding of the meanings that the inhabitants of other worlds have given to their own everyday customs."). So originalism requires enough engagement with founding-era source materials that we may, without tacitly relying on contemporary linguistic assumptions, see what the operative constitutional phrases connoted.

¶ 100   Understanding many of the principles embodied in the Utah Constitution will also require fluency in the political and legal presuppositions and understandings of the ratification era. This is because many constitutional principles are just that—general, abstract principles. But this doesn't mean that we may pour our own contemporary moral views into the constitutional text. Instead, we must seek to understand the requirements these principles would have been understood to embody by the founding generation, and we must apply those requirements to contemporary problems. We can't do this without engaging the founding era's political and legal understandings—"trac[ing] intellectual influences . . . [and] situat[ing] meaning in the flow of discursive activity"—in order to uncover the "presuppositions and silent logical connectives" that collectively formed the era's understanding of the constitutional text, but that time has hidden from our view.[12] Gienapp, *Historicism and Holism*, *supra*, at 955.

---

[12] In this respect we part ways with Professor Solum, who argues that originalist translation doesn't require immersion in the "ideology . . . and ideas" of the ratification period, just its "semantics or pragmatics." Lawrence B. Solum, Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record 19 (Apr. 26, 2017) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3019494.

¶ 101   The fundamental error in the dissent's originalist analysis is that it doesn't immerse itself in Gilded Age sources to uncover and elucidate the principles embodied in the due process provision. It commits this error at both the linguistic and ideological level.

¶ 102   Linguistically, the dissent relies heavily on Lucius Polk McGehee's treatise to support its claim that "the precise means of notice and an opportunity to be heard are not enshrined in the guarantee of due process." *Infra* ¶ 169. According to the dissent, Professor McGehee tells us that "'[t]he basis of due process' consists of 'orderly proceedings and an opportunity to defend.'" *Infra* ¶ 169 (quoting LUCIUS POLK MCGEHEE, DUE PROCESS OF LAW UNDER THE FEDERAL CONSTITUTION 2 (1906)). And the dissent takes this to mean that due process only requires a litigant to be given notice of "the pendency of [a] hearing and given a chance to present his view on the questions presented." *Infra* ¶ 170.

¶ 103   At first blush, this is a reasonable construction. To our contemporary mind "orderly proceedings" and "an opportunity to defend" may very well sound like thin concepts. But a broader engagement with the relevant source material suggests to us that, at the time of ratification, these phrases may have connoted more robust restraints on the legislature than the dissent perceives. For example, Professor McGehee was surely aware of the Court's remarks in *Chicago, Milwaukee and St. Paul Railway Co.*, where the Court indicated that due process would sometimes require elaborate procedural protections, including the right to call witnesses. And other courts drew on Professor McGehee's treatise for the proposition that the due process provision constrained the legislature's authority to prescribe rules of evidence and procedure. *See, e.g.*, *State ex rel. Hurwitz v. North*, 264 S.W. 678, 681 (Mo. 1924) ("The general rule is that the state Legislature has the right to prescribe rules of evidence and rules of procedure. Such rules and laws *must be reasonable*, and give to the party an opportunity to make a defense, for, if they preclude a *full* defense, they would violate due process." (emphases added) (citing MCGEHEE, DUE PROCESS OF LAW UNDER THE FEDERAL CONSTITUTION 80 (1906)).

¶ 104   What this suggests to us is that Professor McGehee's phrase—"orderly proceedings and an opportunity to defend"—might well have been understood to mean something different at the time of the Utah Constitution's ratification than it conveys today. Indeed, in *Blaisdell*, the "opportunity to be heard, and to defend" according to an "orderly proceeding adapted to the nature of the case" was thought to

44

include the requirement of "a trial" including "the right to produce witnesses and to submit evidence." 57 N.W. at 795.

¶ 105   This isn't to take a definitive stand on the meaning of "orderly proceedings and an opportunity to defend." It's only to illustrate that figuring out its meaning—or meanings—requires deep, sympathetic engagement with a wide array of Gilded Age source material. It's a mistake to interpret those phrases with tacit reference to contemporary linguistic understandings.

¶ 106   The dissent also fails to adequately immerse itself in relevant political and legal presuppositions and understandings of the Gilded Age. Take, for example, the dissent's analysis of whether the protections of due process might have been understood to apply to sentencing proceedings. *See supra* Part III.B.1 (responding to this portion of the dissent's analysis). The dissent excerpts a set of treatises according to which offenders have "no constitutional right . . . to confront witnesses at sentence hearings" and "no recognized constitutional right to present witnesses on their [own] behalf." *Infra* ¶ 171 n.52 (quoting ARTHUR W. CAMPBELL, LAW OF SENTENCING § 13:20 (3d ed. 2004)); *see also infra* ¶ 159 n.37 ("There were no announced standards, procedural or substantive, to control a sentencing judge or jury." (quoting Stephen A. Saltzburg, *Due Process, History, and* Apprendi v. New Jersey, 38 AM. CRIM. L. REV. 243, 244 (2001)).

¶ 107   The problem with the dissent's decision to rely on these claims—to the extent they're even accurate, *see supra* Part III.B.1—is that the dissent doesn't consider the degree to which they presuppose or depend on background legal and political assumptions and realities. As we've explained, perhaps there were no "announced standards" applicable to the sentencing phase of a case because there was no meaningful line between the guilt and sentencing phases. *See supra* ¶¶ 77–78. Or perhaps it was because appellate courts had little opportunity, and even less occasion, to even consider what constitutional protections should apply at sentencing.[13] *See supra* ¶¶ 82–

---

[13] For example, courts may not have had a need to invoke constitutional principles because their authority over the common law gave them adequate means to articulate procedural protections. For most of the nineteenth century, criminal law and procedure was exclusively judge-made common law. LAWRENCE M. FRIEDMAN, A HISTORY OF AMERICAN LAW 407 (2d ed. 1985) (noting that the

(cont.)

83. Or perhaps it was because the nineteenth century took it for granted (1) that sentencing evidence would be sworn and (2) that oaths, by themselves, were sufficiently powerful to assure the reliability of evidence. *See supra* ¶ 74 n.9.

¶ 108   If the claims on which the dissent relies turned on any of these background realities or presuppositions, then the dissent is wrong to rely on them. If there were no cases applying due process protections to sentencing because there were no sentencing proceedings, or because few courts had the authority to entertain sentencing appeals, then that tells us little about what due process would've been understood to require in sentencing proceedings had it actually applied. Similarly, if no court applied the due process provision to require confrontation rights or other substantive evidentiary protections only because of the ratification era's general presupposition that sworn testimony was presumptively reliable—backed by the force of a deity—then the demise of this general understanding of the power of the oath suggests that the principle embodied in the due process provision would apply very differently today.

¶ 109   In sum, only through deep immersion in ratification-era language and debates can an originalist hope to uncover the principles that many constitutional provisions originally embodied. A failure of deep immersion will lead to atomistic originalist analysis, and, in turn, constitutional error. We've illustrated how this error may have infected the dissent. And we urge litigants who undertake originalist argument to engage in this kind of deep reading in future cases before us.

---

accomplishments of the codification movement were "fairly meager . . . up to the end of the 19th century"); *see also* Aniceto Masferrer, *The Passionate Discussion Among Common Lawyers About Postbellum American Codification: An Approach to Its Legal Argumentation*, 40 ARIZ. ST. L.J. 173, 177 (2008) (noting that the codification debate took place "[i]n the 1880s and 1890s"). And, common law decisions can be reviewed, and overturned, without invoking constitutional principles. It was therefore only after the success of codification that courts would've felt a need to invoke constitutional principles. But this doesn't mean that those principles wouldn't have been understood to embody many of the common law decisions courts made.

*D. The Relationship Between the Dissent's*
*Methodological Mistake and Its Policy Analysis*

¶ 110   This brings us to the relationship between the dissent's originalist analysis and its policy analysis. The relationship between originalism and policy analysis is different from the relationship between policy and other modes of interpretation. When we're not engaged in originalist research, contemporary policy concerns are never far from our mind. They affect our understanding of the plain meaning of the text, *see Warner v. Goltra*, 293 U.S. 155, 158 (1934) (statutes must be read "in the light of the mischief to be corrected and the end to be attained"); *In re Letters Rogatory Issued by Dir. of Inspection of Gov't of India*, 385 F.2d 1017, 1020 (2d Cir. 1967) (statutes "must be interpreted in terms of the mischief [they were] intended to rectify"), and they help determine when we reach for secondary canons of construction and what to do when we reach for them, *Bagley v. Bagley*, 2016 UT 48, ¶ 27, 387 P.3d 1000 ("[T]he absurd consequences canon . . . resolve[s] an ambiguity by choosing the reading that avoids absurd results." (second alteration in original) (citation omitted) (internal quotation marks omitted)). But originalist analysis requires us to discard our own policy views in order to get a full, sympathetic understanding of the policy considerations that animated a generation with radically different practices, understandings, and concerns.

¶ 111   This is difficult to do. Indeed, there's a long, proud American tradition—dating at least to John Adams—of reading our contemporary policy preferences into ancient texts. *See* BERNARD BAILYN, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION 24–25 (2d ed. 1992) (noting that in 1774, John Adams "had cited Plato as an advocate of equality and self-government but . . . was so shocked when he finally studied the philosopher that he concluded that the *Republic* must have been meant as a satire"). Scholars have even recognized that this makes up part of the deep rhetorical power of originalism.

> [T]he deeper power of originalist argument sounds in the romance of national identity. Whether originalist arguments have [rhetorical] purchase depends less on the accuracy of their historical accounts—or the plausibility of their theories of intertemporal authority—than on whether their audiences recognize themselves, or perhaps their idealized selves, in the portrait of American origins that is on offer.

Richard Primus, *The Functions of Ethical Originalism*, 88 TEX. L. REV. SEE ALSO 79, 80 (2010).

¶ 112 We worry that the dissent has fallen into this trap. The dissent excoriates *Labrum*. The approach *Labrum* employs "undermine[s] the orderly evolution of our law [by] . . . constitutionaliz[ing] fields meant for policymakers." *Infra* ¶ 177. It is "fuzzy and unworkable." *Infra* ¶ 185. "[U]nmanageable." *Infra* ¶ 185. It "dashe[s]" the expectations of the good, law-abiding citizens of this state (who presumably sleep easier when inmates who haven't been convicted of sex crimes are hooked up to penile plethysmograph machines based on a parole officer's hunch). *Infra* ¶ 188. It's a one-way ratchet, laying the groundwork "for ever-expanding procedural mechanisms." *Infra* ¶ 184. "[W]hat about the victim . . . ?" *Infra* ¶ 186. "And what about the general public . . . ?" *Infra* ¶ 186.

¶ 113 We, of course, disagree with the dissent's analysis. Our decision isn't a one-way ratchet; it plainly balances administrability with concerns for accuracy in meting out punishment. *See supra* ¶ 43.[14] The public's interest in sex offenders' receiving treatment is leavened by its commitment to ensuring that we reliably distinguish between those who have committed sex crimes and those who haven't—a commitment to the rule of law that is at the very heart of our society. *See State v. McClellan*, 2009 UT 50, ¶ 29, 216 P.3d 956 ("[O]ur constitutional system is primarily designed to protect the innocent, not punish the guilty."). This protects victims too—it protects all of us from the arbitrary hand of law enforcement.[15]

---

[14] The dissent is concerned that the logic of our decision "provides no stopping point" for new due process protections and will lead to an ever-expanding ambit of procedural requirements. *Infra* ¶ 184. But this decision repeatedly emphasizes that its purpose is to ensure that Parole Board determinations about whether an inmate has committed an unconvicted crime are adequately supported by notice, evidence, and a rationale--concepts that are basic to the system's historic commitment to due process. The dissent's concerns thus appear to be with the entire enterprise of courts' ensuring procedural protections, not with anything distinctive about this case.

[15] We disagree with the dissent's suggestion that we've demonstrated inadequate concern for the victim in this case. *Infra*

(cont.)

¶ 114   More importantly, however, we're troubled by the dissent's willingness to locate its perspective on the law in the past without the benefit of adversarial briefing. The dissent's view—that due process protections may not apply to sentencing and parole, and, even if they do, they don't require any procedural protections designed to ensure accurate, non-arbitrary decisions—is discomfiting. For Mr. Neese, it would mean that the Parole Board could rely on untested allegations to force him to choose between (1) being labeled a sex offender, subjected to the increased risk of violence to which sex offenders are exposed, and required to complete a profoundly invasive and degrading program of treatment (one he can't truthfully participate in if, as he maintains, he isn't a sex offender) or (2) being kept in prison for much of the rest of his life. Even the dissent expresses discomfort with this consequence of its conception of due process—a conception that privileges bright lines over fairness. *See infra* ¶ 120.

¶ 115   But, as we've explained, the past doesn't unambiguously support the dissent's analysis. The dissent's analysis hasn't been briefed to us. And we're accordingly unable to deprive Mr. Neese of the due process protections to which he is entitled under a faithful application of *Labrum*.

**CONCLUSION**

¶ 116   Based on the undisputed facts, we conclude that before the Parole Board considers the unconvicted sexual offense that its hearing officers have questioned Mr. Neese about, article I, section 7 of the Utah Constitution requires it to provide Mr. Neese with the additional procedural protections that this opinion has described. We therefore reverse the district court's order granting summary judgment to the Parole Board in this case and remand for proceedings consistent with this opinion.

———

¶¶ 186–191. While it's correct that Mr. Neese was "convicted of crimes sustaining a sentence of up to thirty-two years in prison," the victim had no legitimate expectation that such a sentence would be sustained based upon unconvicted crimes. *Infra* ¶ 187. In addition, our opinion today doesn't even bar the Parole Board from taking into account unconvicted crimes, it only requires it to afford Mr. Neese a minimal amount of due process before doing so.

DURRANT, C.J., concurring in part and concurring in the result

CHIEF JUSTICE DURRANT, concurring in part and concurring in the result:

¶ 117    I concur in sections I, II, and part A of section III of the majority opinion, but write separately to express my disagreement with parts B, C, and D of section III. I share the majority's view that in *Labrum v. Utah State Board of Pardons*[16] we adopted the proposition that "'original release hearings'—such as the hearing at issue here—'are analogous to sentencing hearings and require due process to the extent that the analogy holds.'"[17] I also agree that, while the due process protections the majority identifies here were not specifically addressed by the *Labrum* court, they are consistent with the core premise of the *Labrum* opinion and are a logical and reasonable extension of that premise. Additionally, I share the majority's view that the dissent's central argument—that "the historical record does not suggest that the nineteenth century understanding of the constitutional right of 'due process' would have extended to sentencing proceedings"[18]—is inconsistent with *Labrum*'s central holding and that to adopt that argument would be to effectively overrule *Labrum*. Finally, I agree with the majority that because Mr. Neese has not sought to overrule *Labrum*, and because neither party has provided us with adequate briefing on the Utah Constitution's due process clause, it is unnecessary to conduct a historical analysis in this case.[19]

¶ 118    But I part paths with the majority's decision to substantively address the dissent's historical analysis. I believe the majority errs in engaging in a debate on the merits as to arguments presented by the dissent, and further errs in putting a thumb on the scale with respect to some of those issues. While the majority refrains from stating "any definite conclusions about this history without the benefit of adversarial briefing,"[20] it nevertheless appears to indicate a preferred

---

[16] 870 P.2d 902 (Utah 1993).

[17] *Supra* ¶ 60 (quoting *Labrum*, 870 P.2d at 908).

[18] *Infra* ¶ 163 n.45.

[19] I also would not seek further briefing on the question of the historical meaning of the due process clause because it is unnecessary to the resolution of this case.

[20] *Supra* ¶ 70.

DURRANT, C.J., concurring in part and concurring in the result

resolution of some key issues.[21] I understand the majority's reluctance to let the dissent's arguments go uncontested, but, for the reasons offered by the majority in support of its view that the dissent has unnecessarily and without adequate briefing set forth a historical analysis, I would not engage in a substantive rebuttal of that analysis.

¶ 119    Determining the correct historical understanding of our state constitution's due process clause is an issue of obvious importance. And it is an issue, as the competing opinions in this case illustrate, fraught with complexity. In my view, this is not the case to engage in substantive debate on this issue, either in the first instance or in rebuttal.

––––––––––––––

[21] *See, e.g., supra* ¶ 71 ("Contrary to the dissent, it appears to us that the reports may contain notable examples of cases that applied procedural protections to sentencing proceedings."); *supra* ¶ 72 ("*Williams*, in turn, relied on *State v. Reeder*. It appears to us, however, that *Reeder* and the cases on which it relied may stand for the proposition that sentencing judges must *adhere* to norms of due process when settling on a sentence."(citation omitted)); *supra* ¶ 74 ("The other cases on which *Reeder* relied likewise appear to potentially recognize the importance of procedural protections in connection with sentencing."); *supra* ¶ 75 ("So, contrary to the dissent, it appears to us that procedural protections may have been understood to apply to sentencing proceedings in the period leading up to ratification of the Utah Constitution."); *supra* ¶ 78 ("And there's good reason to think due process protections may have applied at sentencing.").

ASSOCIATE CHIEF JUSTICE LEE, dissenting:

¶ 120   I share some of the majority's concerns about the fairness of the procedures afforded to Neese by the Parole Board. The Board's refusal to allow Neese to call and question his accuser made it difficult for him to persuasively refute the sex-offense charge against him. And without a persuasive means of rebuttal, Neese is likely to face substantially more prison time than most other inmates serving time for his crime of conviction (obstruction of justice). He would also serve that time without a trial-like adjudication of the sex-offense charge in question.

¶ 121   For these and other reasons I might endorse the procedures set forth in the majority opinion if I were in a position to make policy in this field—to promulgate administrative rules governing the Parole Board. I hedge—saying only that *I might*—because I am certain that my understanding of the Board's decisionmaking process is incomplete. And I frame this conclusion in the subjunctive—speaking of what I might do *if I were* in a position to promulgate rules for the Board—to underscore the limited scope of our authority in a case like this one. In deciding this case we are deciding only on the demands of the Utah constitution. We are not deciding what set of procedural rules strike us as ideal under these circumstances.

¶ 122   The line between those two concepts is too often blurred in modern judicial thinking. And the blurriness is perhaps at its height when we speak of the requirements of "due process." Here, perhaps more than in other constitutional fields, it is tempting to think of the constitutional requirement of due process as a general charter for assuring a vague ideal of fairness—an ideal that will ebb and flow or evolve over time. But that is not what is enshrined in the due process clause. "[T]he Due Process Clause is not a free-wheeling constitutional license for courts to assure fairness on a case-by-case basis." *In re Discipline of Steffensen*, 2016 UT 18, ¶ 7, 373 P.3d 186. "[I]t is a constitutional standard" with a specific, if somewhat flexible, meaning. *Id*.

¶ 123   The idea of a fixed construct is inherent in the very nature of constitutional law. The whole point of having a written constitution is to "establish the fundamental ground rules for lawmaking"—the "fixed bulwarks" we deem essential to protect us against "tyrannies of the majority." *State v. Houston*, 2015 UT 40, ¶ 149, 353 P.3d 55 (Lee, A.C.J., concurring in part and concurring in judgment) (citation omitted).

Without those "fixed bulwarks" we lose our grip on the rule of law, and we substitute in its place the preferences of mere judges. *See Washington v. Trump*, 858 F.3d 1168, 1184 (9th Cir. 2017) (Bybee, J., dissenting) (offering the important reminder that "[w]e are judges, not Platonic Guardians").

¶ 124   The point is not that our law cannot evolve. It is to remember that the constitution preserves extra-judicial means of our law's adaptation: (a) "amendment of the constitution through the super-majoritarian procedures set forth in its provisions," and (b) "implementation of policies embraced by the people through their representatives in the political branches of government" (such as by "adoption of statutes, regulations, and other laws within the limitations prescribed in the constitution"*). Houston*, 2015 UT 40, ¶ 151 (Lee, A.C.J., concurring in part and concurring in judgment).

¶ 125   For these reasons I find it important to take a step back from the approach embraced by the majority. I would not begin by accepting the broadest conception of our opinion in *Labrum v. Utah State Board of Pardons*, 870 P.2d 902, 909–10 (Utah 1993). That decision admittedly deserves some measure of respect as a matter of *stare decisis*. But the majority in my view is extending the premises of the *Labrum* decision to their logical extreme—a step that *stare decisis* does not require. *See supra* ¶ 39 (noting that the Parole Board has asked us to limit *Labrum* "to its facts," but concluding that "our task is to faithfully apply our precedent" absent a request that we overrule it). *Labrum* did not decide the question presented here.[22] *See infra* ¶¶ 139–43. So we can uphold

---

[22] Neese himself has not asserted that this case is controlled by *Labrum*. The *Labrum* opinion isn't even cited in Neese's opening brief. And the discussion of *Labrum* in the reply brief amounts only to (a) an assertion that *Labrum* "did not address what process was due in a parole hearing in which the prisoner's status as a sex offender was adjudicated"; and (b) an assertion that the federal Due Process Clause should be interpreted more expansively and that those "broader protections . . . are supreme." Appellant Reply Br. at 11–12.

For these reasons it seems to me that the majority is engaging in the very enterprise it seeks to pin on me—of advocating a basis for resolving this case that is not precisely presented by the parties. The majority's extension of *Labrum* is a matter of the court's own independent analysis. I say that to highlight what I see as some

(cont.)

*Labrum* without ruling in Neese's favor. And in my view we should carefully consider the basis of the court's analysis in *Labrum* before extending it in the manner that the court does today.

¶ 126   The majority criticizes my approach on two principal grounds—(a) the concern that I am engaged in independent analysis of historical material without the benefit of adversary briefing, *see supra* ¶ 67; and (b) the assertion that I am urging a decision overruling *Labrum* while the court is just upholding that decision on *stare decisis* grounds, *supra* ¶¶ 51, 57. I respond to these and other points in detail below. For now I would note (1) that I favor supplemental briefing on the historical basis for our decision in this case; (2) that my colleagues are not just preserving *Labrum* but are extending it—establishing a new standard of due process in parole hearings that is nowhere dictated on the face of *Labrum*; and (3) that the majority's extension of *Labrum* is not one expressly requested by Neese (and accordingly not subjected to adversary briefing). *See infra* ¶¶ 137–43.

¶ 127   My colleagues apparently prefer not to seek further briefing from the parties on the historical questions that I am addressing. That is their prerogative. But I would think that their decision to decline further briefing, *see supra* ¶¶ 50 n.5, 51, might blunt their criticism of my historical analysis of the due process clause.

¶ 128   The majority is establishing a significant new rule of constitutional law in resolving this case. It holds for the first time that the Utah Constitution guarantees a right to cross-examination in a parole hearing. That right is nowhere enshrined in our precedent—or at all dictated by the analytical framework of *Labrum*.

¶ 129   Neese himself has not invoked the *Labrum* opinion as a basis for the parole procedures he claims to be lacking. He bases his due process argument principally on federal authorities—citing *Labrum* only in his reply brief, and only there in an attempt to try to distinguish it (in response to the Parole Board's argument that Neese was afforded all of the process that he was due under *Labrum*).

---

overexuberance in the court's criticism of my independent analysis of the due process clause, and not to question the court's right to engage in this independent analysis. The due process question is adequately presented and briefed, after all, and the court is not just entitled but expected to use its own lights in resolving it.

¶ 130 The bottom line is that the briefing on the state constitutional question presented is quite minimal. That leaves us with two choices—either to seek supplemental briefing or to move forward with what we have. I would seek further briefing. But I also find the matter adequately presented, and I see no barrier to our resolving it (either by application of precedent or by resort to historical materials).

¶ 131 I would resolve this issue by analyzing the text and original meaning of the due process clause of the Utah Constitution. Thus, I would apply the historical framework of due process that I have outlined previously. *See In re Adoption of K.A.S.*, 2016 UT 55, ¶¶ 45–100, 390 P.3d 278 (Lee, A.C.J., dissenting). And I would affirm the district court's decision dismissing Neese's claims because I find no basis in the text or original meaning of the Utah due process clause to call into question the procedural framework adopted by the Parole Board (much less, to sustain the specific procedures deemed required by the majority).

¶ 132 In the paragraphs below I begin with some background on the due process framework that I would apply. Then I analyze Neese's claim against this backdrop. And I close with some observations about concerns with the majority's approach even accepting the (non-originalist) premises of its analysis.

I

¶ 133 The due process clause does not confer on the judiciary a roving "duty to establish ideal systems for the administration of justice, with every modern improvement and with provision against every possible hardship that may befall." *In re Discipline of Steffensen*, 2016 UT 18, ¶ 7 n.2, 373 P.3d 186 (quoting *Ownbey v. Morgan*, 256 U.S. 94, 110–11 (1921)). It implicates a historically driven test "measured by reference to 'traditional notions of fair play and substantial justice.'" *Id.* ¶ 7 (quoting *ClearOne v. Revolabs*, 2016 UT 16, ¶ 8, 369 P.3d 1269).

¶ 134 We have warned against the perils of a notion of due process as "a free-wheeling constitutional license for courts to assure fairness on a case-by-case basis." *Id.* Yet our cases have not always heeded these principles. As judges, too often we skate past the words "due process" and blithely assume the prerogative of constitutionalizing our personal sense of fair procedure. In so doing we forget about the "usual course" for assuring procedural fairness—the legal means of promulgating rules or laws regulating procedure. *See id.* (noting that the "usual course" for assuring fairness "is by

promulgating rules of procedure"). That means is available here; the Parole Board has the authority and means of promulgating and amending the administrative rules that govern its proceedings.[23] And the Parole Board's rules should stand unless they can be shown to run afoul of the historically rooted standard of "due process."

¶ 135   The constitutional standard, moreover, can be understood only by reference to its text and historical meaning. The text of the clause is simple: "No person shall be deprived of life, liberty or property, without due process of law." UTAH CONST. art. I, § 7. This text implicates two sets of questions: (a) what sorts of proceedings trigger a right to "due process of law"; and (b) what procedures are secured by the guarantee of "due process of law."

¶ 136   We should answer both questions with reference to the historical understanding of the terms of the due process clause. First, the applicability of the due process clause should depend on whether the proceeding in question is one historically understood to threaten a deprivation of "life, liberty or property." And second, the procedures secured by this provision should look to those historically understood as rooted in the guarantee of "due process."

¶ 137   I consider these questions because, unlike the majority, I find no answer to the question presented in our precedent. The majority claims to find an answer in *Labrum v. Utah State Board of*

---

[23] UTAH CONST. art. VII, § 12(2)(a) ("The Board of Pardons and Parole . . . may grant parole, . . . commute punishments, and grant pardons after convictions, . . . subject to regulations as provided by statute."); UTAH CODE § 77-27-5(5) ("In determining when, where, and under what conditions offenders serving sentences may be paroled [or] pardoned, . . . the board shall . . . develop and use a list of criteria for making determinations under this [s]ubsection . . . ."); *id.* § 77-27-9(4)(a) ("The board may adopt rules consistent with law for its government, meetings and hearings, the conduct of proceedings before it, the parole and pardon of offenders, the commutation and termination of sentences, and the general conditions under which parole may be granted and revoked."); UTAH ADMIN. CODE r. 671-101 ("Board of Pardons rules shall be processed according to state rulemaking procedures. . . . Rules are to be interpreted with the interests of public safety in mind so long as the rights of a party are not substantially affected.").

*Pardons*, 870 P.2d 902 (Utah 1993). It cites that opinion for the proposition that the due process clause "require[s] more than simply giving the inmate an opportunity to speak and 'point out errors' in his file" when the Parole Board "bases its decisions on untested allegations that an inmate has committed a sex offense." *Supra* ¶ 55 (citation omitted). In that circumstance the majority says that *Labrum* requires "advanced written notice of the alleged sex offense," an opportunity to call and examine "witnesses," and "an explanation of the Parole Board's decision." *Id*.

¶ 138   Yet none of these requirements are anywhere set forth in the *Labrum* opinion. Indeed there is nothing in *Labrum* that at all dictates the procedure that the court today endorses as a requirement of due process. And the court's extension of *Labrum* is not advocated by Neese, and thus has not been subjected to adversary briefing.

¶ 139   The majority claims to be following the "framework" of the *Labrum* opinion. *Supra* ¶¶ 27, 60–61. But *Labrum* doesn't establish an operative constitutional framework for application in future cases. It simply concludes—based on the "reality" that parole hearings "are analogous to sentencing hearings," 870 P.2d at 908—(a) that an inmate has some due process rights at the initial parole hearing, *id.* at 911; and (b) that those rights include the right to "know what information the Board will be considering at the hearing . . . soon enough in advance to have a reasonable opportunity to prepare responses and rebuttal of inaccuracies," *id*. at 909.

¶ 140   There is no clear rationale or "framework" for these decisions in the *Labrum* opinion. The closest the *Labrum* court comes to identifying a basis for its decision is the assertion that the procedure embraced by the court advances "two critical functions related to fundamental fairness"—"minimizing error and preserving the integrity of the [parole] process."[24] *Id.; see also id*. at 910 (asserting that

---

[24] The doctrine of *stare decisis* urges courts to apply "the first decision by a court on a *particular question of law* . . . [to] later decisions by the same court." *State v. Thurman*, 846 P.2d 1256, 1269 (Utah 1993) (emphasis added). And my approach is consistent with that principle. *Labrum* says that some process is due "to the extent that the analogy [between parole hearings and sentencing hearings] holds." *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 908 (Utah 1993). But *Labrum* also notes that determining "[t]he extent to which additional due process

(cont.)

"[a]ccuracy and fairness are essential in proceedings which impinge as directly on personal liberty as original parole grant hearings"). The majority repeats that assertion here. *See supra* ¶ 24. It says that the right to call and cross-examine witnesses is similarly essential to advance these "critical functions." *Supra* ¶¶ 44–45.

¶ 141   But that conclusion is by no means dictated by *Labrum*. The "critical functions" formulation in *Labrum* is not a workable legal standard; it is a circular confirmation for whatever procedure a majority of this court may deem appropriate. *Any* additional procedure, after all, can be said to "minimiz[e] error" and "preserv[e] the integrity of the [parole] process." 870 P.2d at 909.

¶ 142   *Labrum* thus leaves unanswered the crucial question of the "framework" for deciding any future requirements of the Due Process Clause in parole hearings. To the extent there is a "framework" in *Labrum* it is the notion that due process requires whatever additional "procedure" a majority of this court deems to be helpful. And that is not a framework or rationale that is deserving of *stare decisis* deference. *See State v. Guard*, 2015 UT 96, ¶ 56, 371 P.3d 1 (overruling the "clear break" rule in part because it is unworkable and requires courts to exercise a large amount of discretion, "introduc[ing] a level of unpredictability that is not appropriate when dealing with the application of critically important rules").

¶ 143   *Labrum* did not resolve the question of the demands of the due process clause in response to "untested allegations" of a sex offense raised in a parole setting. *Supra* ¶ 55. We are answering that question as a matter of first impression here. And I see no way to answer that question without a careful analysis of the original meaning of the due process clause of the Utah Constitution.

II

¶ 144   Historically, only certain proceedings were understood to threaten a deprivation of "life, liberty or property" in a manner

protections must be afforded inmates in [a parole hearing] will require case-by-case review." *Id.* at 911. Applying the decision in *Labrum* simply requires this court to afford due process rights to the extent that a parole hearing is analogous to a sentencing hearing and to assess additional due process on a case-by-case review. My analysis does exactly that. *See infra* Part II.

triggering a right to "due process." *See infra* Part II.A. The threshold question in my view is whether the parole hearings at issue here should count as that sort of proceeding. And for reasons set forth below I think the historical record cuts against such a conclusion. *See infra* Part II.B.

¶ 145   The *Labrum* court concluded otherwise. *See Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 911 (Utah 1993). And *Labrum*, as noted, may be entitled to *stare decisis* deference on this threshold point. But *stare decisis* does not demand blind extension of our past decisions to their logical extreme. At most it requires a *logical* extension of our precedents. And to decide on the logical extension of *Labrum* we should inquire into the logic—or the theoretical basis—of that decision. [25]

¶ 146   The majority claims only to be applying the holding of the *Labrum* decision. But again the court is doing more than that. It is establishing a broad conception of *Labrum*—the notion that due process requires any additional parole procedure that a majority of the court views as advancing the interest of fundamental fairness. *See supra* ¶ 33.

---

[25] I seek not to overrule *Labrum*. Or even to "confine [it] to its precise facts." *Supra* ¶¶ 56–57. I am just observing that the *Labrum* opinion does not dictate an answer to the question presented here. To decide how much procedure is constitutionally required in response to "untested allegations" of a sex crime in a parole hearing we must do more than just apply *Labrum*.

The majority is surely doing more than that in its opinion. It is not just citing *Labrum* as dictating the answer to the question presented. It is establishing a wholly new constitutional requirement based on the majority's sense of where best to draw the line—concluding that the right to cross-examination is essential to "due process" in response to an allegation of a sex crime raised in a parole hearing, except where "the safe [and effective] administration of the prison system requires otherwise." *Supra* ¶¶ 43, 53. That may be a good line to draw. But the line doesn't come from *Labrum*. It comes from the majority's sense of fairness in the unique circumstances presented in this case.

I'm all for "transparency." *Supra* ¶ 58. That's the whole point of my opinion. Because I find no answer to the question presented here in *Labrum* I am seeking to identify a basis for decision in the text and original meaning of the Utah Constitution—the source of first principles for any question not clearly controlled by settled precedent. This seems to me the path of true transparency. *Supra* ¶ 58.

*Labrum* nowhere expressly articulates that as the controlling constitutional framework. So in that sense the majority itself is also revisiting the underlying basis for our decision in *Labrum*. It is just doing so implicitly.

¶ 147　The majority's due process construct yields no logical stopping point—and no real guiding legal principle. Indeed the majority itself nowhere expressly articulates an "anything a majority of us deem necessary is required" standard of due process. If that is in fact the operative principle then we should say so. If there is some other basis for the decision then we should say that. We owe it to the parties—and to lower courts and to the bar, who will be governed by our opinion—to identify a transparent legal basis for the direction of our law in this important area.[26]

¶ 148　To do that we need to return to first principles. And those principles, in my view, must start with an inquiry into the historical basis for extending the protections of the Due Process Clause to the parole process. We can reexamine the premises of the *Labrum* decision while still respecting the premises of the doctrine of *stare decisis*.[27] I would do so here on grounds set forth below.

---

[26] I cannot see how my resort to first principles would undermine the "coherence" of our jurisprudence in this field. *Supra* ¶ 64. I find the implicit premises of the *Labrum* line of cases to be quite incoherent. And the whole point of my historical inquiry is to try to bring discipline and transparency to this important field.

It seems to me that it is the majority that is engaged in the enterprise of deciding our cases by a "'show of hands'" rather than a "'rule of law.'" *Supra* ¶ 65 (quoting *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 618 (2007) (Scalia, J., concurring in the judgment)). The standard the court attributes to the *Labrum* line of cases is all about a show of hands—attributing to the due process clause whatever standards of fairness a majority of this court can agree to in any given circumstance. That is not a coherent legal standard. And it is not a workable rule of law.

[27] *Cf. Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 312 (1997) (Scalia, J., concurring) (stating that "the so-called 'negative' Commerce Clause is an unjustified judicial invention, not to be expanded beyond its existing

(cont.)

¶ 149 At a minimum we need to consider the extent of the "process" that is due in a case like this one. *Labrum*, again, doesn't dictate an answer to that question.[28] And our determination of the demands of due process must accordingly be informed by an inquiry into the original understanding of the constitutional guarantee.[29] That

---

domain" but also reaffirming willingness to "enforce on *stare decisis* grounds" the applications of that doctrine in prior cases).

[28] Nor do the cases handed down in *Labrum*'s wake. Our subsequent decisions admittedly accepted the premises of *Labrum*—that the due process guarantee extends to at least some parole proceedings, that due process is aimed at assuring fairness in those proceedings, and that "this procedural right [i]s not unlimited." *Supra* ¶ 62. Thus, in *Neel v. Holden*, 886 P.2d 1097 (Utah 1994), and *Monson v. Carver*, 928 P.2d 1017 (Utah 1996), we established a few new due process rights in the parole process and declined to establish others. But our opinions still failed to provide a concrete legal basis for the lines that we were drawing—except the bare notion that the procedures we required struck the court as necessary to protect a vague principle of fairness and the procedures we refused to endorse seemed unnecessary. *See Neel*, 886 P.2d at 1103 (refusing to require the disclosure of confidential information "when that disclosure might lead to harm of a third person"); *Monson*, 928 P.2d at 1030 (refusing to allow inmate to call character witness because the court concluded that the proffered testimony would not "substantially further[] the accuracy and reliability of the [Parole] Board's fact-finding process"). Thus, our precedents don't answer the question presented in this case. And in my view that requires us to return to first principles to find a guiding standard for our decisions in this important field.

[29] The majority, to its credit, recognizes the importance of an inquiry into the "original meaning of the Utah Constitution when [we are] properly confronted with constitutional issues." *Supra* ¶ 67. But it then criticizes my historical inquiry on the basis of a supposed lack of "prompting from the parties." *Supra* ¶ 67. And it questions my originalist analysis on the basis of a lack of adversary briefing. *Supra* ¶ 67.

To the extent the majority is suggesting that the originalist questions that I am exploring are not properly presented I disagree. The question of the reach and extent of the due process guarantee in a parole proceeding like this one is the key question presented for our decision.

(cont.)

understanding is simple and straightforward. The due process clause "refers to certain fundamental rights which [our] system of jurisprudence . . . has always recognized." *In re Adoption of K.A.S.*, 2016 UT 55, ¶ 87, 390 P.3d 278 (Lee, A.C.J., dissenting) (alterations in original) (quoting *Hurtado v. California*, 110 U.S. 516, 536 (1884)). Basic "notice" of the pendency of a legal proceeding is one of the "fundamental rights" long understood to be protected as a matter of due process. *See In re Adoption of B.Y.*, 2015 UT 67, ¶ 16, 356 P.3d 1215. The other is an essential "opportunity" to be heard. *Id.* Yet the precise terms and conditions of these guarantees, if any, must be based on historical inquiry. The constitutionally guaranteed *manner and means* of notice and the right to be heard are not to evolve in accordance with the policy preferences of judges over time. Instead the core constitutional right is the preservation of *some* minimal notice and opportunity to be heard. And history is an important guide: "Procedures . . . consistent with the common law and historical tradition [are] presumptively permissible, while new procedures [are] permissible so long as they [do] not deny one of the core protections of due process, such as a right to notice and a meaningful opportunity to be heard." *In re Adoption of K.A.S.*, 2016 UT 55, ¶ 90 (Lee, A.C.J., dissenting).

¶ 150   This is another basis for questioning the majority's extension of *Labrum*. The historical precedent cuts against the recognition of the now-constitutionalized right to call witnesses in a sentencing-like proceeding. I can accept, on *stare decisis* grounds, *Labrum*'s premise that initial parole hearings are analogous to sentencing proceedings for due process purposes.[30] *See supra* ¶¶ 26–28; *Labrum*, 870 P.2d at 908. But that

---

And because I find no answer to that question in our precedent it is essential to resort to first principles. In that sense the parties have effectively prompted an analysis of the historical material that I am examining.

To the extent the court is lamenting the lack of detailed briefing on the historical questions at issue I agree—but I find the majority's criticism puzzling. Because I find the originalist questions I address here properly presented but not adequately briefed I would have preferred requesting supplemental briefing.

[30] "Our cases," after all, "have not said that an original parole hearing is identical for all purposes to a sentencing hearing before the trial court." *Monson*, 928 P.2d at 1029.

does not end the inquiry. We must also determine whether additional due process protections—beyond those identified in *Labrum*—must be afforded here. *Labrum*, 870 P.2d at 911. And we will search the historical record in vain for support for the idea that a defendant at sentencing had a due process right to be "heard" *by calling witnesses* or *cross-examining them*. *See infra* Part II.B. The newly-established due process right to a written sentencing decision is even more novel. To my knowledge no court has ever found such a right—not historically (as of the founding of the Utah Constitution) and not even in modern jurisprudence. And these are further reasons to doubt the constitutional propriety of the majority's decision.

### A

¶ 151   The threshold question is whether a parole hearing is the sort of proceeding that triggers a constitutional right to due process. Textually, that question turns on whether such a hearing threatens the deprivation of "life, liberty or property." And the originalist gloss on that question is whether the public understanding of this provision would encompass a hearing like the one at issue here.

¶ 152   One version of the originalist inquiry might start with the premise that modern parole hearings were unknown to the generation of the framing of the Utah Constitution. Because today's parole hearings were not invented until nearly two decades after the framing of our Due Process Clause,[31] the argument could be made that the right to due process does not attach.

¶ 153   The argument *could* be made. But it wouldn't be a good argument. It would be an argument based on a debunked form of originalism. Thoughtful originalists distinguish between an *application* of the constitution and the public *understanding* of the legal principle expressed by its terms.[32] They view the constitution—like all law—as

---

[31] Our state constitution was written and adopted in 1895 and took effect in 1896. Utah's indeterminate sentencing regime was instituted by statute in 1913. *See* 1913 Utah Laws 192–93.

[32] Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 NOTRE DAME L. REV. 1, 21 (2015) ("[T]he communicative content of the constitutional text is fixed at the time of framing and ratification, but the facts to which the text can be applied change over time." (emphasis omitted)).

consisting of *legal principles* expressed by the *public understanding of its terms*. But they do not foreclose *new applications* of those principles to circumstances unknown to the past. Quite the contrary, they view the prospect of such applications as essential to and inherent in the notion of constitutional law. Thoughtful originalists acknowledge that a constitution incapable of extending its principles to new applications cannot fulfill the promise of establishing fixed bulwarks to protect fundamental rights. And they thus adopt an originalist inquiry that looks to the public understanding of the constitution's terms, not the applications envisioned by the framers.

¶ 154   This is mainstream originalism, or "original public meaning" originalism. This form of originalism should be distinguished from "original intent" originalism.[33] The original intent inquiry is sometimes framed (often by critics) as turning on pure silliness—on "what would James Madison have thought" (or what would our Utah framers have thought) about a particular modern problem. And the answer to that question is usually obvious—nothing, because the framers never could have thought about our modern problems. But that is irrelevant to an original public meaning originalist, because she is looking for the public *understanding* of the operative legal principle at play. It doesn't really matter what the framers might have thought about particular modern problems, because that oversimplified inquiry has to do with *applications*, not the public *understanding*, of the legal principles enshrined in a constitutional text.

¶ 155   A Fourth Amendment problem may help to illustrate. The framers obviously would not have had any specific opinion about whether using a thermal-imaging device to examine a private home for unusual sources of heat (a sign of marijuana cultivation) is a "search"

---

[33] John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 Nw. U.L. Rev. 751, 761 (2009) ("[O]riginal public meaning, in contrast to original intent, interpret[s] the Constitution according to how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment . . . [and] is now the predominant originalist theory . . . .").

triggering the protections of the Fourth Amendment. But that is the wrong question to ask.

¶ 156   The right question to ask is whether the original public meaning of the legal principle encompassed within the protection against "unreasonable search and seizure," U.S. CONST. amend. IV, would have prohibited using a thermal-imaging device in that way, sans warrant. And it is entirely possible to conclude that the original understanding of that principle encompasses visual inspection by thermal-imaging—if, for example, we think of the notion of a "search" as any operation that violates, in any manner, a homeowner's reasonable expectation of privacy. *See Kyllo v. United States*, 533 U.S. 27, 34–35 (2001) (Scalia, J., for the majority) (concluding that the original meaning of a Fourth Amendment "search" encompasses the use of a device by the government that "is not in general public use," to obtain information "regarding the interior of [a] home" that would previously have been unknowable without "physical 'intrusion into a constitutionally protected area'" (citation omitted)).

¶ 157   The Fourth Amendment example helps to focus the question presented in this case. The proper question before us is not whether the framers of the Utah Constitution would have thought that parole hearings trigger a right to due process. Instead we should ask what legal principle the Utah public would have understood in the guarantee of "due process" as a prerequisite to any deprivation of "life, liberty or property." And to answer that question we may need to look for historical analogies to the modern premises before us.

¶ 158   The majority, citing *Labrum*, says that the best analogy is to criminal sentencing proceedings.[34] *Supra* ¶ 27. That seems fair in a functional sense, as it is the parole board that makes the ultimate decision of how long a given person will remain incarcerated. *See supra* ¶ 27 ("The Parole Board's conduct in this case is, at a minimum, closely analogous to a sentencing court's considering uncharged or

---

[34] The majority also analogizes Neese's parole hearing to "a judicial fact-finder . . . adjudicating the inmate guilty of a criminal offense," or a "criminal trial[] and the closely related context of [a] prison disciplinary proceeding[]." *Supra* ¶ 29. Yet the court nowhere explains how these alternative analogies cut.

unconvicted conduct in fixing a defendant's sentence."). I will accept the analogy for present purposes.[35]

¶ 159    Even accepting the analogy, however, the historical record cuts against the majority's decision. There is little historical basis for a conclusion that the due process clause was understood to extend in any meaningful way to sentencing proceedings. The historical view—from the time of the framing of the U.S. Constitution and continuing through the nineteenth century—was that a person's "liberty" was implicated only by the determination of guilt.[36] The historical record suggests that no one thought that sentencing involved a second deprivation.[37]

---

[35] But this premise is by no means a given. *See, e.g.*, *Vitek v. Jones*, 445 U.S. 480, 493 (1980) ("Undoubtedly, *a valid criminal conviction and prison sentence* extinguish a defendant's right to freedom from confinement. Such a *conviction and sentence* sufficiently extinguish a defendant's liberty 'to empower the State to confine him in any of its prisons.'") (emphases added) (citations omitted); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution"). It would not be unreasonable to say that a convicted defendant's due process rights are exhausted after "a conviction and sentence." Under this view, the due process clause would require *absolutely nothing* during original parole hearings, because the defendant's liberty interest has been extinguished "until the maximum [incarceration] period has been reached unless sooner terminated or commuted by authority of the Board of Pardons and Parole." UTAH CODE § 77-18-4(3).

[36] *Cf. Williams v. New York*, 337 U.S. 241, 245–46 (1949) (highlighting how, historically, "strict evidentiary procedural limitations" governed proceedings where the "question for consideration [was] the guilt of the defendant," but during sentencing, a judge was not "hedged" by procedural rules and "could exercise a wide discretion").

[37] *See* Stephen A. Saltzburg, *Due Process, History, and* Apprendi v. New Jersey, 38 AM. CRIM. L. REV. 243, 244 (2001) ("[T]here were no announced standards, procedural or substantive, to control a sentencing judge or jury . . . .").

LEE, A.C.J., dissenting

¶ 160    In the eighteenth century and early nineteenth century there was no such thing as a sentencing proceeding as we understand it today. Upon a conviction after trial the court imposed a statutorily required penalty.[38] And that was the end of the matter. Things changed over the ensuing decades leading up to the framing of the Utah Constitution. There was a marked shift toward discretionary sentencing—first by judges and eventually through decisions made by parole boards.[39] Even then, however, no one conceived of trial-level "due process" rights as attaching to sentencing.

¶ 161   Throughout the late nineteenth and early twentieth centuries, judges and parole boards enjoyed wide discretion to determine the appropriate sentence.[40] Yet sentencing and parole proceedings were never treated like trials. The rules of evidence generally did not apply. *Cf. Williams v. New York*, 337 U.S. 241, 251 (1949) ("The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial

---

[38] Alan M. Derschowitz, *Criminal Sentencing in the United States: An Historical and Conceptual Overview*, 423 ANNALS AM. ACAD. POL. & SOC. SCI. 117, 124–25, 128 (1976) ("Specific crimes were punished, according to the colonial criminal codes, with relatively specific penalties."); *see, e.g.*, COMPILED LAWS OF THE TERR. OF UTAH § 1840 (1876) ("The several sections of this code which declare certain crimes to be punishable as therein mentioned devolve a duty upon the court authorized to pass sentence, to determine and impose the punishment prescribed.").

[39] Derschowitz, *Criminal Sentencing*, *supra*, at 128 (describing the movement over time from statutorily-prescribed sentences for specific offenses to an indeterminate sentencing regime); Alan C. Michaels, *Trial Rights at Sentencing*, 81 N.C. L. REV. 1771, 1812 n.169 (2003); ARTHUR W. CAMPBELL, LAW OF SENTENCING §§ 1:2–1:3 (3d ed. 2004).

[40] *See generally* Carissa Byrne Hessick & F. Andrew Hessick, *Procedural Rights at Sentencing*, 90 NOTRE DAME L. REV. 187 (2014); *see also* CAMPBELL, LAW OF SENTENCING, *supra*, at § 9:3 ("[S]entences . . . determined by trial judges . . . ride upon one of the most powerful and pervasive doctrines in the law of sentencing: any sentence within constitutional and statutory limits will be upheld on appeal as long as it was selected by the proper exercise of judicial discretion.").

procedure.").[41] Sentencing judges had "wide discretion" to consider "[o]ut-of-court affidavits." *Id.* at 246. And there is no evidence that

---

[41] The majority cites cases purportedly undermining this conclusion. It says that the cases cited in *Williams* establish that certain "procedural protections may have been understood to apply to sentencing proceedings in the period leading up to ratification of the Utah Constitution." *Supra* ¶ 75. The majority's interpretation of the cases it cites may well be correct. But these cases tell us nothing of relevance to the question presented here. The question before us is whether the procedural guarantees *of the due process clause* were understood to apply in sentencing proceedings. Nothing in the majority's cited cases speaks to that question. These cases suggest, at most, that certain rules of evidence and procedure were deemed to apply at sentencing. *Compare supra* ¶ 72 (stating that the cases *Williams* relied on "may stand for the proposition that sentencing judges must *adhere* to norms of due process when settling on a sentence"), *with State v. Reeder*, 60 S.E. 434, 435 (S.C. 1908) (upholding the trial court's consideration of "affidavits tending greatly to aggravate the crime" without any reference to due process), *and State v. Smith*, 2 S.C.L. (Bay) 62, 63 (S.C. Ct. Const. App. 1796) (allowing the defendant to submit mitigating evidence to the sentencing court without any reference to due process), *and Kistler v. State*, 54 Ind. 400, 404 (Ind. 1876) (relying on the Cruel and Unusual Punishments Clause to ensure "that all penalties are proportioned to the nature of the offence" without any reference to due process), *and People v. Vermilyea*, 7 Cow. 108, 143 (N.Y. Sup. Ct. 1827) (nothing that sentencing courts should consider "the circumstances in evidence" without any reference to due process). In fact, the *Reeder* court even notes that admitting aggravating affidavits does *not* raise constitutional concerns because "the verdict of the jury is not affected." 60 S.E. at 435. And the defendant's "constitutional right to be confronted by witnesses against him and to have the privilege of cross-examining them" terminates once the jury decides the guilt phase of the trial, so long as the trial judge does not "attempt to alter the verdict of the jury." *Id.*

The majority's cases on character evidence, *see supra* ¶ 78, fall short for similar reasons. We can stipulate to the possibility that "character evidence was often introduced for sentencing purposes" during the nineteenth century. *Supra* ¶ 78. But that tells us nothing about whether the right to introduce such evidence—or to present any other evidence—was viewed as an element of the constitutional right to "due

(cont.)

defendants had any constitutional right to call[42] or cross-examine witnesses.[43] *Id.* at 250 ("We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination.").

¶ 162 At no point in this important timeframe (the nineteenth century—the period leading up to the framing of the Utah Constitution) did anyone raise a due process challenge to these

---

process." The majority has cited nothing in support of that proposition. And the cases it does cite speak only to the applicability of rules of evidence or procedure—not the requirements of due process. Our rules of evidence and procedure are certainly amenable to adaptation and amendment over time. And I'm quite open to the possibility of amending such rules to account for the current needs of our sentencing system. But the availability of that mechanism of adaptation does not tell us that the constitutional guarantee of due process must also evolve.

[42] *See* CAMPBELL, LAW OF SENTENCING, *supra*, at § 13:20 ("Just as there is no constitutional right for all offenders to confront witnesses at sentence hearings, there is as yet no recognized constitutional right to present witnesses on their behalf."); *see also Reeder*, 60 S.E. at 435.

[43] *Reeder*, 60 S.E. at 435 ("Certainly there is no ground for saying that [submitting affidavits in aggravation during a sentencing proceeding] would deny to the defendant the constitutional right to be confronted by witnesses and to have the privilege of cross-examining them, for the reason that the verdict of the jury is not affected."). It is not even necessarily true that a defendant's traditional right to attend his own sentencing hearing, *see* FRANCIS WHARTON, A TREATISE ON THE CRIMINAL LAW OF THE UNITED STATES 54, 298 (1874), springs from due process. CAMPBELL, LAW OF SENTENCING, *supra*, at § 9:14 ("American caselaw reveals no uniform source of authority for an offender's right to be present at sentencing. Depending on the jurisdiction, it is said to arise from common law, the federal constitution, state constitution, statutes, or court rules."). Due process might not even require a sentencing hearing at all. *Cf.* CAMPBELL, LAW OF SENTENCING, *supra*, at 10:4 ("Most jurisdictions consign to judicial discretion the decision to hold sentencing hearings.").

discretionary sentencing proceedings. Certainly there are no judicial decisions establishing a constitutional right to due process in these proceedings.[44]

¶ 163 That is an important "dog that didn't bark." If the generation of the framing of the Utah Constitution viewed the constitutional guarantee of due process of law to attach to sentencing proceedings, surely someone would have raised the argument.[45] Surely a court would have endorsed that view.[46]

---

[44] Stephen Saltzburg, for example, quotes Justice O'Connor's dissenting opinion in *Apprendi v. New Jersey*, 530 U.S. 466, 523–54 (2000), and states that she "is undoubtedly correct that the Court never . . . worried about due process when it came to non-capital sentencing. However, she did not explain why the Court should not have, or why liberty had been given such short shrift for so many years." Saltzburg, *Due Process*, *supra*, at 249. A plausible explanation, given the historical record, is simply that litigants never raised the issue. It is not that "liberty had been given such short shrift," but rather that no defense attorney ever imagined that "due process" might demand extra procedures at sentencing.

[45] The majority implies that appellate avenues for asserting a due process challenge to a sentencing proceeding may have been foreclosed by governing rules of appellate jurisdiction. *See supra* ¶¶ 81–82. But the majority's cited authority does not support this conclusion. *See Appellate Review of Sentencing Procedure*, 74 YALE L.J. 379, 381–82 & n.22 (1964) (noting that "[s]everal cases . . . stand as exceptions to the rule of non-review" and that "[c]lose examination of this group of decisions . . . reveals that they contain an implicit distinction between review of the merits of a sentence and review of the procedure leading to a sentence," where procedure "cover[s] not only . . . traditional elements, but also the format and criteria which the judge uses in imposing sentences, including presentencing reports, requests for probation and referrals for mental examination"). Other authority, moreover, cuts the other way—indicating that a party with a federal constitutional basis for challenging a sentence was entitled to raise that challenge on appeal. *See e.g.*, *United States v. Tucker*, 404 U.S. 443, 447 (1972) (holding that federal due process is violated when a sentence is imposed on the basis of "misinformation of constitutional magnitude"); *Townsend v. Burke*, 334 U.S. 736, 741 (1948) (holding that federal due

(cont.)

process is violated when a court relies on "extensively and materially false" evidence to impose a sentence on an uncounseled defendant).

I will stipulate that state courts in the nineteenth century "were rarely called upon to assess the constitutionality of statutes that dealt with criminal procedure." *Supra* ¶ 84 (citation omitted). And it seems likely that this grew out of the fact that the historical basis for assuring fair process was "through the common law." *Id.* But that seems to me to cut against the majority's conclusions and in favor of mine. My whole point is that the historical record does not suggest that the nineteenth century understanding of the constitutional right of "due process" would have extended to sentencing proceedings. And for that reason I would leave the development of fair procedure for other (non-constitutional) mechanisms like rulemaking.

⁴⁶ It may well be that the lack of any historical right to cross-examination in sentencing was rooted in a longstanding (but today outmoded) faith in "the power of oaths to assure the reliability of evidence." *Supra* ¶ 74 n.9. And the evolution in our thinking about the power of an oath could well be a reason to amend our rules of evidence to allow for more procedure in sentencing. But that doesn't tell us that the historical understanding of due process must likewise evolve in a manner that responds to our modern sensibilities. The Utah Constitution prescribes mechanisms for amendment. *See* UTAH CONST. art. XXIII, § 1. If the people think that a principle enshrined in the document has outlived its usefulness they are free to initiate the process for amending that principle. But if the guarantee of "due process" was not historically understood to apply to sentencing then it is not the role of a court to revise the principle of due process to conform to modern sensibilities.

Sentencing is not some "new application" of the principle of due process. *See supra* ¶ 74 n.9. Sentencing proceedings have been around since well before the founding of our Utah Constitution. So if the founding-era notion of "due process" was not viewed as extending to sentencing then the due process guarantee doesn't apply to sentencing. The scope of the due process guarantee is an aspect of the governing "legal principle." We may now view the thinking behind that principle to be outmoded. But that is at most a basis for amending the constitution. It is not a license for a judicial reformulation. And it

(cont.)

¶ 164    Yet the historical record is silent on this matter. And that is significant.[47] It suggests that the public understanding of the right to "due process of law" largely did not extend to sentencing proceedings.[48] The apparent premise of this view is that a sentencing does not involve an independent "depriv[ation] of life, liberty or property"—such deprivation occurs at the guilt phase of a trial, and there is no second deprivation of liberty implicated by sentencing. Any decision to impose less than the maximum sentence, in this view, is an

---

certainly isn't a "new application" that the framers hadn't thought about.

[47] It may be that sentencing was more a matter for jury determination during the nineteenth century. *See supra* ¶ 77. And that may be part of the explanation for a lack of "appellate cases applying procedural protections to the 'sentencing phase' of a criminal proceeding" in the relevant time period. *Supra* ¶ 77. But that doesn't tell us anything of relevance to the question of whether the guarantee of due process was understood to apply in sentencing proceedings. I have cited extensive historical material supporting my answer to that question. The majority, at most, has identified explanations for a lack of historical material cutting the other way. That is insufficient. The burden of establishing the unconstitutionality of existing parole procedures falls on Neese. So if the most that can be said is that the historical record is at best hazy then the burden has not been carried.

[48] *Cf. Apprendi*, 530 U.S. at 545 (O'Connor, J., dissenting) ("During the age of broad judicial sentencing discretion, judges frequently made sentencing decisions on the basis of facts that they determined for themselves, on less than proof beyond a reasonable doubt, *without eliciting very much concern from civil libertarians.*" (emphasis added) (quoting Gerald E. Lynch, *Towards A Model Penal Code, Second (Federal?): The Challenge of the Special Part*, 2 BUFF. CRIM. L. REV. 297, 320 (1998))); *Williams*, 337 U.S. at 246 ("[B]oth before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. Out-of-court affidavits have been used frequently . . . ." (citations omitted)).

act of grace[49]—a grant of greater liberty than the defendant was entitled to. And on that basis the original understanding of the right to due process does not extend to sentencing proceedings.[50]

¶ 165   This does not, of course, mean that no process should ever be afforded in such proceedings. It just means that the question is primarily left to policymakers—to those charged with exercising the discretion to decide on appropriate rules for sentencing proceedings.[51]

---

[49] The majority resists this premise, citing historical material suggesting that parole is based on a "treatment" model and not a principle of mercy or grace. *See supra* ¶ 87. But "treatment" and "grace" are hardly incompatible. The material cited by the majority suggests not that parole was not a discretionary matter of legislative grace but instead that such discretion was to be exercised with an eye toward prospects for treatment.

The constitutional question presented is whether a discretionary parole decision—whether as an act of grace or as an inquiry into fitness for release under a "treatment" framework—is a proceeding that was historically understood to be protected by the constitutional right to due process. Nothing in the majority's historical materials contradict my conclusion on this core question.

[50] *See, e.g.*, Alan C. Michaels, *Trial Rights at Sentencing*, *supra*, at 1812 n.169 (noting that the reason that defendants were not entitled to see the information to be used at sentencing could "perhaps . . . [be] derived from a view that a sentence below the maximum was . . . considered a potential act of leniency that created no procedural entitlements") (citing Sanford H. Kadish, *Legal Norm and Discretion in the Police and Sentencing Processes*, 75 HARV. L. REV. 904, 919–20 (1962)).

[51] A legislative or administrative decision to offer more process, moreover, would not alter the underlying constitutional due process baseline. *Cf. McMillan v. Pennsylvania*, 477 U.S. 79, 92 (1986) ("We have some difficulty fathoming why the due process calculus would change simply because the legislature has seen fit to provide sentencing courts with additional guidance."); *see also Williams*, 337 U.S. at 250–51 ("The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure. So to treat the due-process clause would hinder if not preclude all courts— state and federal—from making progressive efforts to improve the

(cont.)

¶ 166    Our *Labrum* opinion resolved this matter the other way. *See Labrum*, 870 P.2d at 909 ("[D]ue process . . . requires that the inmate know what information the Board will be considering at the hearing and that the inmate know soon enough in advance to have a reasonable opportunity to prepare responses and rebuttal of inaccuracies."). That decision may be entitled to deference as a matter of *stare decisis*. But, again, that does not mean that we are required to *extend* that decision further. And the above history provides grounds for leaving *Labrum* where it is and not inventing additional procedures not established by that opinion.

B

¶ 167    The above-cited history is also relevant to the second due process question presented—to the nature or extent of the procedures guaranteed by "due process." Here we can assume that a parole hearing is the sort of proceeding involving a deprivation of liberty that triggers a right to due process. But we still have to decide on the content of the constitutional guarantee—on how much process is constitutionally due.

¶ 168    I see no ground for constitutionalizing whatever procedure a majority of this court might find reasonable. That kind of policymaking is not in the nature of constitutional interpretation. If we are to constitutionalize a field of law we must root our decision in the text and original meaning of the constitution. And such an inquiry would look to the procedures viewed as inherent in due process at the time of the framing of the Utah Constitution.

¶ 169    Those procedures, as noted above, encompassed the basic rights of notice and an opportunity to be heard in accordance with "some settled course of judicial proceedings," *In re Adoption of K.A.S.*, 2016 UT 55, ¶ 88, 390 P.3d 278 (Lee, A.C.J., dissenting) (citation omitted)—rights long viewed as "fundamental" to our "system of jurisprudence," *id.* ¶ 87 (Lee, A.C.J., dissenting) (quoting *Hurtado v. California*, 110 U.S. 516, 529 (1884)). *See also* LUCIUS POLK MCGEHEE, DUE

_____

administration of criminal justice."). That is because article I, section 7's "due process" guarantee is based on the original public understanding of that language in 1896, not the public understanding in 2017. Later developments—whether legal, political, or social—do not change that baseline.

PROCESS OF LAW UNDER THE FEDERAL CONSTITUTION 2 (1906) ("The basis of due process" consists of "orderly proceedings and an opportunity to defend."). Yet the precise means of notice and an opportunity to be heard are not enshrined in the guarantee of due process. *See In re Adoption of K.A.S.*, 2016 UT 55, ¶ 87. Our system leaves decisions on those matters to adaptation and evolution over time by policymakers.

¶ 170 Neese was afforded a basic right of notice and an opportunity to be heard. He was advised of the pendency of the parole hearing and given a chance to present his view on the questions presented. *See* UTAH ADMIN. CODE r. 671-202-1. In other words he was afforded the procedures established by this court in our *Labrum* decision. *See Labrum*, 870 P.2d at 909 ("[D]ue process . . . requires that the inmate know what information the Board will be considering at the hearing and that the inmate know soon enough in advance to have a reasonable opportunity to prepare responses and rebuttal of inaccuracies."). And I see no reason to conclude that the original understanding of "due process" would have entitled him to any more than that.

¶ 171 Certainly the historical record does not support the notion of a right to call witnesses.[52] Or to receive a written decision explaining the basis of the sentencing decision.[53]

¶ 172 Historically, the defendant's rights at sentencing were minimal. At the time of the framing of the Utah Constitution no one would have thought that the right to due process implicated a right to call witnesses or review a written sentencing decision. *See* CAMPBELL, LAW OF SENTENCING, *supra*, at § 10:5 (stating that the "strong nationwide

_____

[52] *Cf.* CAMPBELL, LAW OF SENTENCING, *supra*, at § 13:20 ("Just as there is no constitutional right for all offenders to confront witnesses at sentence hearings, there is . . . no recognized constitutional right to present witnesses on their behalf."); *Williams*, 337 U.S. at 250 ("We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination.").

[53] *See* Hessick & Hessick, *Procedural Rights*, *supra*, at 190–91 ("[S]entencing courts were not required to provide the reasons for the sentences that they imposed.").

trend to require reasons for sentences" began only in the "late-1970s"). Indeed the process afforded by the Parole Board far exceeds anything that would have been available historically. The Board gives prospective parolees a right to review everything in the Board's file, UTAH ADMIN. CODE r. 671-303-1(1),[54] an opportunity to respond in writing to any matters in the file, *id.* r. 671-303-1(2), the prerogative of appearing and testifying to the Board, *id.* r. 671-301-1(A) & (B), and even a right to file requests for reconsideration or "special attention reviews," *id.* r. 671-316-1 (redetermination review procedure); *id.* r. 671-311-1 (special attention review procedure). And the Board guarantees that its "[d]ecisions . . . will be reduced to a written order," which generally are "accompanied by a brief rationale for the order." *Id.* r. 671-305-1.

¶ 173   This process goes well beyond that afforded to convicted persons at sentencing proceedings in the nineteenth century. And that is a further basis for rejecting the majority's decision.

### III

¶ 174   The majority hedges in its articulation of the due process rights available in a parole hearing. It says that the constitutional right "to call witnesses and present documentary evidence" attaches "unless the safe and effective administration of the prison system requires otherwise." *Supra* ¶ 43. That may be a helpful caveat. At the very least it is a wise recognition of our lack of expertise and understanding of the parole process.

¶ 175   But the court's caveat also highlights a basic problem with the majority's analysis. We have little knowledge of the day-to-day operations of the Parole Board. And the briefing in this case offers little insight into the possible effects of a decision to announce a new constitutional right to call witnesses. Perhaps that means that any right to call witnesses must be framed as tentative and conditional. But this also underscores a problem with the decision to constitutionalize this field of law.

---

[54] Compare that Board-created right with the historical approach: "Despite repeated litigation on a variety of grounds, disclosure of a court's presentence report was not constitutionally required until a few tribunals started doing so in the late 1970s." CAMPBELL, LAW OF SENTENCING, *supra*, at § 9:12.

¶ 176   We have a means of preserving the need for a "safe and effective administration of the prison system." It is to respect the traditional role of the Parole Board in adopting rules of procedure in this field—and to leave the limits of the Due Process Clause to the procedures historically understood to be guaranteed by the constitution.

¶ 177   We undermine the orderly evolution of our law when we constitutionalize fields meant for policymakers. Our constitutional decisions are set in stone, so to speak, and are not easily set aside. We should take that into account before we enshrine a right to call witnesses or to receive a written sentencing decision.

¶ 178   It may be a step in the right direction to acknowledge the countervailing interest in "the safe and effective administration of the prison system." But that does not adequately capture the costs and concerns on the other side of the balance. We cannot properly talk about the best process—let alone the constitutionally mandated process—for a *parole system* if we are focused only on the "effective administration of *the prison system*." We must also account for the needs of an effective *parole system*. And the most we can say on that point here is that those charged with managing that system have determined that the right to call or cross-examine witnesses is a procedure that interferes with the "safe and effective administration" of parole in Utah. Surely there are good reasons for that decision.

¶ 179   We can characterize the Parole Board's process as effectively "a miniature criminal trial." *Supra* ¶ 46. But that does not make it so. In our system of justice the Parole Board performs a very different function from the trial court. The Board is not deciding on guilt or innocence. Nor is it even resolving the questions presented to a trial court at sentencing—like the important question, for example, of whether to impose a sentence or instead suspend it upon conditions of probation. *See* UTAH CODE § 77-18-1(2)(a).

¶ 180   Instead, the Parole Board is making a more holistic, discretionary decision—whether and when to allow an inmate committed to serve up to a statutory maximum term to be released on parole at an earlier date.[55] These decisions are sensitive ones. And our

---

[55] *See Mission and Jurisdiction*, UTAH BOARD OF PARDONS & PAROLE, https://goo.gl/At6Fes (last visited July 1, 2017) ("The mission . . . is to

(cont.)

law has long recognized that we can account for all of these sensitive considerations only if we preserve the subjective, discretionary judgment of the Parole Board.

¶ 181   We interfere with that discretion when we constitutionalize the Parole Board's processes. And in so doing we threaten the longstanding premises of parole in our criminal justice system. The more we formalize this process the more we threaten the equilibrium of our existing system of criminal justice. We should hesitate before proclaiming a full understanding of the costs and benefits of superimposing additional procedures on a system that remains mostly hidden from judicial scrutiny. *See* UTAH CODE § 77-27-5(3) ("Decisions of the board in cases involving paroles, pardons, commutations or terminations of sentence . . . are final and are not subject to judicial review.").

¶ 182   The "critical functions" of due process cited in *Labrum* are not a legal test. *See supra* ¶ 28 (citing the minimization of "error" and the promotion of the "perception of fairness" as considerations requiring the procedures required by the majority); *Labrum*, 870 P.2d at 910 (describing "[a]ccuracy and fairness" as "essential" concerns of due process). They are just *benefits* of additional procedure. And if we cite only the benefits—the upsides—of additional procedure we will have a one-way ratchet that will always result in *more* constitutionally required procedure.

¶ 183   That is the majority's methodology. It treats the minimization of error and the promotion of the perception of fairness as the touchstones for assessing the requirements of the due process clause. *See supra* ¶ 28. And, not surprisingly, the court concludes that more procedure—a right to call witnesses and to a written ruling—is required.

---

provide fair and balanced release, supervision, and clemency decisions that address community safety, victim needs, offender accountability, risk reduction, and reintegration."); UTAH CODE § 77-18-5 (allowing the judge and prosecutor to send a statement to the board "with any information which might aid the board"); *id.* § 77-27-13(1) (requiring corrections officers to "furnish the board with pertinent information regarding an offender's physical, mental, and social history and his institutional record of behavior, discipline, work, efforts of self-improvement, and attitude toward society").

¶ 184    This is another fatal flaw in the majority's approach. The court ultimately does not identify an operative legal principle or legal test. It simply identifies grounds for ever-expanding procedural mechanisms. The court purports to identify only two new due process rights at parole hearings—the right to call witnesses and the right to a written ruling. But its mode of reasoning provides no stopping point. If we take the majority opinion at face value we can anticipate that more and more procedural rights are to come. Under the majority's approach any additional mechanisms that can be thought to decrease the risk of error and increase the perception of fairness may eventually be "required" by the due process clause. So long as a majority of the court concludes that additional procedures advance these goals, they may be viewed as required by the Utah Constitution.[56]

¶ 185    The court's articulated factors are as fuzzy and unworkable as they are unmoored from history. The inquiry into the perception of fairness seems particularly unmanageable. Fairness is a two-way street. And the inmate is only one side of the criminal justice equation. The other side encompasses interests protected by the state—the public generally and also victims. And fairness to those groups' interests should also be weighed in the balance.

¶ 186    I understand that an inmate in Neese's position might "question the integrity of a system in which the Parole Board could . . . adjudge him a sex offender and postpone his release date for up to twenty-eight years based solely on unproven allegations and without . . . the opportunity to call witnesses." *Supra* ¶ 32 (emphasis omitted). But what about the victim of Neese's crimes? And what about the general public, with an interest in seeing that inmates are not released on parole in circumstances in which there is a perceived risk to the public? What about the perception of fairness on this side of the balance?

---

[56] *Cf.* ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 39 (1997) (rejecting a theory of constitutional interpretation premised on the question of "the *desirable* result for the case at hand," where "the Constitution . . . mean[s] what it *ought* to mean[;] Should there be . . . a constitutional right to die? If so, there is. Should there be a constitutional right to reclaim a biological child put out for adoption by the other parent? Again, if so, there is. If it is good, it is so." (citations omitted)).

¶ 187   Neese's victim saw him convicted of crimes sustaining a sentence of up to thirty-two years in prison. And the victim understood that Neese could be required to serve that full term unless the Parole Board exercised its discretion to authorize his early release on parole. Under longstanding procedures, the Parole Board could be expected to exercise its discretion to consider conduct not resulting in a conviction, *see Alvillar v. Bd. of Pardons & Parole*, 2014 UT App 61, ¶ 6, 322 P.3d 1204, 1208 ("[T]he Board may consider and weigh any factors that it deems relevant to its determination of whether or not an inmate will be afforded parole . . . ."), and to require Neese to participate in rehabilitation programs in prison to assure that any release would not cause undue risk to the public. *See, e.g.*, UTAH ADMIN. CODE r. 671-402-1(A) ("The Board may add special conditions to a standard parole agreement. Special conditions are generally intended to help hold an offender accountable or to help rehabilitate an offender."). And Neese's victim would have understood that Parole Board procedures would not have allowed Neese to call witnesses in any parole hearings. *Id.* r. 671-308-3(b) ("Only the offender, a person appointed by the Board to assist an offender pursuant to this rule, or a victim as provided for by Utah law may present testimony or comment during a hearing.").

¶ 188   All of these expectations will be dashed by the majority's decision today. And Neese's victim will "justly question the integrity of a system," *supra* ¶ 32, that allows Neese to change the rules of the parole game midstream.

¶ 189   The majority's warning about the effects of the Parole Board's procedures on plea bargains strikes me as backwards. I do not see how we can say that a defendant has a "justifiabl[e]" expectation that charges dismissed on a plea bargain will not "come roaring back at their parole hearing." *Supra* ¶ 33. Our longstanding parole system makes that a very real possibility. It tells convicted defendants that they may well have to serve the full extent of their imposed sentence, *see* UTAH CODE § 77-18-4(2) & (3), that the decision to release them early is a matter within the discretion of the Parole Board, *see id.* § 77-18-4(3), that that discretion can take into account a range of considerations affecting the inmate's risk to the public, *see Alvillar*, 2014 UT App 61, ¶ 6, and that the inmate has no right to call witnesses at a parole hearing, *see* UTAH ADMIN. CODE r. 671-308-3(b). With all this in mind, a defendant like Neese is in no position to claim surprise at the Parole Board's approach—or concern about the effect on incentives in plea-bargaining.

¶ 190 If anything it is Neese's victim whose interests and expectations are being undermined. By establishing a new set of procedural rights never before established in the parole system the majority undermines Neese's victim's justifiable expectations. It is the victim whose expectations are being undermined here. And victims like her "will be justifiably wary" of plea deals involving the dismissal of sex-offense charges, if the victims know they may be called in to testify in future parole hearings.

¶ 191 We can disagree about whether a right to call witnesses at a parole hearing is a good idea. But so long as we are talking about fairness and justifiable expectations we should paint the full picture. And that picture must include victims and the public.

———————